# United States Court of Appeals
## For the First Circuit

Nos. 10-1883, 10-1947, 10-2052

SONY BMG MUSIC ENTERTAINMENT, ET AL.,

Plaintiffs, Appellants/Cross-Appellees,

v.

JOEL TENENBAUM,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Paul D. Clement, with whom Jeffrey S. Bucholtz, Erin E. Murphy, King & Spalding, LLP, Timothy M. Reynolds, Eve G. Burton, Holme, Roberts & Owen, LLP, Matthew J. Oppenheim, and Jennifer L. Pariser were on brief, for plaintiffs-appellants.

Jeffrey Clair, with whom Tony West, Assistant Attorney General, Carmen Ortiz, United States Attorney, and Scott R. McIntosh were on brief, for the United States as plaintiff-appellant.

Charles R. Nesson and Jason Harrow for defendant-appellee.

Julie A. Ahrens, with whom Anthony T. Falzone, Stanford Law School Center for Internet & Society, Michael Barclay, Corynne McSherry, Electronic Frontier Foundation, Jason M. Schultz, Samuelson Law, Technology & Public Policy Clinic, were on brief for Electronic Frontier Foundation, amicus curiae.

September 16, 2011

**LYNCH**, **Chief Judge**.    Plaintiffs, the recording companies Sony BMG Music Entertainment, Warner Brothers Records Inc., Arista Records LLC, Atlantic Recording Corporation, and UMG Recordings, Inc. (together, "Sony"), brought this action for statutory damages and injunctive relief under the Copyright Act, 17 U.S.C. § 101 et seq.  Sony argued that the defendant, Joel Tenenbaum, willfully infringed the copyrights of thirty music recordings by using file-sharing software to download and distribute those recordings without authorization from the copyright owners.

The district court entered judgment against Tenenbaum as to liability.  The jury found that Tenenbaum's infringement of the copyrights at issue was willful and awarded Sony statutory damages of $22,500 for each infringed recording, an award within the statutory range of $750 to $150,000 per infringement that Congress established for willful conduct.  See 17 U.S.C. § 504(c).

Upon Tenenbaum's motion for a new trial or remittitur, the district court skipped over the question of remittitur and reached a constitutional issue.  It reduced the damage award by a factor of ten, reasoning that the award was excessive in violation of Tenenbaum's due process rights.  See Sony BMG Music Entm't v. Tenenbaum, 721 F. Supp. 2d 85 (D. Mass. 2010).

The parties have cross-appealed.  Sony argues the district court erred, for a number of reasons, in reducing the

-3-

jury's award of damages and seeks reinstatement of the full award. It defends the liability and willfulness determinations.

Tenenbaum challenges both liability and damages. He challenges the Copyright Act's constitutionality and the applicability of the Copyright Act and its statutory damages provision to his conduct. Tenenbaum also argues that the district court committed various errors that require a new trial, and that a further reduction of the damage award is required by the due process clause.

The United States, intervening to defend the constitutionality of the Copyright Act, argues that the district court erred in bypassing the question of common law remittitur to reach a constitutional issue.

We reject all of Tenenbaum's arguments and affirm the denial of Tenenbaum's motion for a new trial or remittitur based on claims of error as to the application of the Copyright Act and error as to the jury instructions. However, the court erred when it bypassed Tenenbaum's remittitur arguments based on excessiveness of the statutory damages award and reached the constitutional due process issue. We agree with the United States that the doctrine of constitutional avoidance requires consideration of common law remittitur before consideration of Tenenbaum's due process challenge to the jury's award. We reverse the reduction in damages, reinstate the original award, and remand for consideration

-4-

of the common law remittitur question.  We comment that this case raises concerns about application of the Copyright Act which Congress may wish to examine.

I.

Background

A.      District Court Proceedings

Sony brought this action against Tenenbaum in August 2007, seeking statutory damages and injunctive relief pursuant to the Copyright Act.  Sony pursued copyright claims against Tenenbaum for only thirty copyrighted works, even though it presented evidence that Tenenbaum illegally downloaded and distributed thousands of copyrighted materials.

Sony's complaint elected to seek statutory, not actual damages, pursuant to 17 U.S.C. § 504(c).  For each act of infringement, § 504(c) establishes an award range of $750 to $30,000 for non-willful infringements, and a range of $750 to $150,000 for willful infringements.

Tenenbaum filed several pre-trial motions, including a motion to dismiss Sony's complaint on the ground that the Copyright Act is unconstitutional.[1]  After the United States intervened to

---

[1]      Tenenbaum argued that the statutory damages available under 17 U.S.C. § 504(c) are excessive so as to violate due process, and that the Copyright Act effectively creates an unconstitutional delegation of prosecutorial functions by creating a private right of action to enforce copyright protections.  The second argument is not made on appeal.

defend the constitutionality of the Act, the district court rejected Tenenbaum's motion without prejudice to allow Tenenbaum to challenge the constitutionality of any award ultimately issued by the jury. The district court also considered and rejected a fair use defense put forth by Tenenbaum.

A five-day jury trial was held from July 27 to July 31, 2009. Following the conclusion of testimony, the district court partially granted Sony's motion for judgment as a matter of law, holding that Sony owned the thirty copyrights at issue and that Tenenbaum infringed those copyrights through his downloading and distribution activities. The court left to the jury the questions of (1) whether Tenenbaum's infringement was willful and (2) the amount of statutory damages to be awarded. In instructing the jury, the court informed it of the statutory range Congress had established for willful and non-willful infringements and articulated a non-exhaustive list of factors it could consider in determining the damage award.

The jury found that Tenenbaum had willfully infringed each of Sony's thirty copyrighted works. The jury returned a damage award, within the statutory range, of $22,500 per infringement, which yielded a total award of $675,000.

Tenenbaum filed a post-trial motion seeking a new trial on various grounds[2] or a reduction of the jury's award.  Tenenbaum argued that although the jury's award fell within the statutory range prescribed by Congress, (1) common law remittitur was both available to the court and appropriate in this case, and (2) the award was excessive such that it violated due process.  The court rejected Tenenbaum's arguments for a new trial.

Regarding the size of the award, the court declined to decide the common law remittitur issue, based on its assumption that Sony would not agree to a reduction of the award and that remittitur would only necessitate a new trial on the issue of damages, and that even after a new trial the same issue of constitutional excessiveness would arise, so, in its view decision on the issue was inevitable.  The court itself then found that the award violated due process, over objections that it utilized an impermissible standard, and reduced the award from $22,500 per infringement to $2,250 per infringement for a total award of $67,500.

---

[2]    He argued a new trial should be granted on the grounds that the court had erred in rejecting Tenenbaum's fair use defense; that the court erred in its evidentiary ruling to exclude portions of a November 2005 letter from Tenenbaum in which he offered to destroy any illegally downloaded files as part of settlement negotiations; that the court's jury instructions were improper, primarily because they informed the jury of the statutory range for damages; and that statutory damages should not be available to Sony because Sony never offered evidence that they suffered more than nominal damages.

B.          Factual Background

We recite the underlying facts in the light most favorable to the jury's verdict.  Analysis Grp., Inc. v. Cent. Fl. Invs., Inc., 629 F.3d 18, 20 (1st Cir. 2010).

   1.          The Music Recording Industry and Peer-to-Peer Networks

Plaintiffs are several of the largest recording companies in the United States, and engage in discovering, developing, and marketing music recording artists and distributing the musical works those artists record.  They hold exclusive rights to copy and distribute various music recordings under United States copyright law, including the thirty recordings at issue in this case, and their primary source of revenue is the sale of those recordings.

Plaintiffs only sell copies of their copyrighted recordings for profit.  They never sell licenses to their copyrighted works that include rights to upload recordings to the internet for public consumption.  The value of such a blanket license would be enormous, as the grant of such a license would deprive the companies of their source of income and profits and essentially drive them out of business.[3]

_____

   [3]    A representative of Universal Music Group testified, "If the suggestion is that we could somehow give these [recordings] to people and tell them, do with them what you will, we lose complete control over our assets, we cannot make money off those assets, and that defeats the whole purpose of our existence."

-8-

In the late 1990s, copyrighted music recordings, including those held by the plaintiffs, began to appear on file-sharing software called "peer-to-peer networks" without the authorization of the copyright holders.

Peer-to-peer networks enable individuals both to make digital files stored on their own computers available to other network users and to download such files from the computers of others. Files shared between users of these networks do not pass through a central computer, but are instead exchanged directly from one user's computer to another. Through the use of these peer-to-peer networks, the unauthorized and illegal downloading and distribution of copyrighted materials--especially music recordings--became commonplace. See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 919-20, 923 (2005) (describing operation of peer-to-peer networks and noting that their advent has likely resulted in copyright infringement on a "staggering" scale). Because music recordings are loaded onto peer-to-peer networks in digital form, recordings downloaded from peer-to-peer networks are virtually indistinguishable from recordings purchased through lawful means, making enforcement difficult.

The proliferation of these networks from 1999 onward and the piracy they enable has had a significant negative impact on the recording industry. Between 1999 and 2008, the recording industry as a whole suffered a fifty percent drop in both sales and

revenues, a figure plaintiffs attribute to the rise of illegal downloading. This reduction in revenues has, in turn, diminished recording companies' capacities to pursue, develop and market new recording artists. It also affected the companies' employees. The loss in revenues has resulted in a significant loss of industry jobs. Sony BMG Music Entertainment and Warner Music Group, for example, each have suffered a fifty percent reduction in workforce since 2000.

Shortly after peer-to-peer networks first appeared, plaintiffs acknowledged the threat they posed to their industry and initiated a broad campaign to address the illegal infringement of copyrighted materials. They started educating the public that downloading and distributing copyrighted songs over peer-to-peer networks constituted illegal copyright infringement. Plaintiffs also brought legal actions as part of their campaign, and initially targeted the proprietors of peer-to-peer networks, not the individuals who actually used those networks to illegally procure and distribute copyrighted materials. See, e.g., id. at 940 (holding network may be held liable for copyright infringement undertaken by third party network users where network promotes such infringements even if network has other, legal uses). Although these litigation efforts succeeded at shutting down particular networks, individual infringers continued to engage in illegal

conduct by finding new peer-to-peer networks through which to download copyrighted songs.

Consequently, record companies began to identify and pursue legal actions against individual infringers. The industry identified Internet Protocol (IP) addresses of users known to be engaged in a high volume of downloading and distributing copyrighted materials, and initiated lawsuits against those users. See Atl. Recording Corp. v. Heslep, No. 06-CV-132, 2007 WL 1435395 at *1-3 (N.D. Tex. May 16, 2007) (detailing recording industry's litigation efforts). These suits began in 2002 and were widely-publicized.[4]

### 2.    Tenenbaum's Conduct

Tenenbaum was an early and enthusiastic user of peer-to-peer networks to obtain and distribute copyrighted music recordings. He began downloading and distributing copyrighted works without authorization in 1999. In that year, he installed the Napster peer-to-peer network on his desktop computer at his family's home in Providence, Rhode Island. He used Napster both to download digital versions of copyrighted music recordings from other network users and to distribute to other users digital

---

[4]    We are aware of only one other action against an individual that has proceeded to trial. See Capitol Records, Inc. v. Thomas-Rasset, No. 06-1497, 2011 WL 3211362 (D. Minn. July 22, 2011).

versions of copyrighted music recordings already saved on his own computer.

Because it enabled copyright infringement, see A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001), the Napster network was shut down in 2001. This did not stop Tenenbaum from downloading and distributing copyrighted works; he instead began using other peer-to-peer networks for the same illegal purposes. These networks included AudioGalaxy, iMesh, Morpheus, Kazaa, and Limewire. Tenenbaum shifted to these other networks after Napster's termination despite his knowledge that Napster was forced to close on account of a lawsuit brought against it for copyright infringement.

Tenenbaum continued to download and distribute copyrighted materials through at least 2007. During that time span he accessed a panoply of peer-to-peer networks for these illegal purposes from several computers. From 1999 until 2002, he primarily downloaded and distributed copyrighted works to and from his desktop computer at his family's home in Providence. He left home to attend Goucher College in Baltimore, Maryland, in 2002, at which point he began using a laptop to download and distribute copyrighted works. Following his graduation from Goucher in 2006, he began using a second laptop for these purposes in tandem with his other computers. Over the duration of Tenenbaum's conduct, he intentionally downloaded thousands of songs to his own computers

from other network users. He also purposefully made thousands of songs available to other network users. He did this in the period after lawsuits were brought, and publicized, against individuals who downloaded and distributed music without authorization. At one point in time in 2004 alone, Tenenbaum had 1153 songs on his "shared-directory" on the Kazaa network.[5] Any of those files within Tenenbaum's shared directory could be easily downloaded by other Kazaa users. Although there was no way to determine the exact number of times other users had downloaded files from Tenenbaum's shared directory, it was frequent. Most of the networks Tenenbaum used had a "traffic tab" that informed him of the frequency with which other users were downloading his shared files. Tenenbaum regularly looked at the traffic tab, and he admitted it "definitely wasn't uncommon" for other users to be downloading materials from his computer.

Tenenbaum knew that his conduct, both his downloading and distribution, was illegal and received warnings the industry had started legal proceedings against individuals. He received several warnings regarding the potential liability his actions carried with

---

[5]    MediaSentry, the third party firm that Sony retained to identify individuals engaged in the illegal downloading and distribution of copyrighted recordings, discovered the 1153 songs in Tenenbaum's Kazaa shared-directory on August 10, 2004. MediaSentry then downloaded portions of 1148 of the 1153 files and verified that the files were the actual songs identified in each file's title, and that Tenenbaum had actually made copyrighted materials available for unauthorized copying.

them. While Tenenbaum was at Goucher college in 2002, his father, Dr. Arthur Tenenbaum, called him to warn him that his use of peer-to-peer networks to obtain and distribute music recordings was unlawful. Dr. Tenenbaum knew that his son was illegally downloading music because, prior to leaving for college, Tenenbaum had showed his father the array of songs that could be downloaded from the Kazaa network. After Dr. Tenenbaum became aware that lawsuits were being brought against individuals who used file-sharing programs to download and distribute music, he instructed Tenenbaum not to continue to engage in such conduct. Dr. Tenenbaum testified that, during their conversation, Tenenbaum did not appear concerned about the consequences of his actions. Despite his father's request, Tenenbaum continued his illegal activity.

Tenenbaum also received direct warnings from Goucher College. Each year Tenenbaum received a Goucher student handbook warning that using the college's network to download and distribute copyrighted materials was illegal, but he did so anyway. The handbook also warned that illegally downloading and distributing music files could subject the copyright infringer to up to $150,000 of liability per infringement, alerting Tenenbaum to his potential exposure for violating the law. The Fall 2003 handbook issued to Tenenbaum at the start of his sophomore year cautioned:

> To avoid the risk of potential lawsuits due to copyright infringement, the college is advising students to carefully restrict the use of file sharing applications to material

-14-

> that is legal to share. . . . Persons found to
> be infringed may be held liable for
> substantial damages and attorneys fees. The
> law entitles a plaintiff to seek statutory
> damages of $150,000 for each act of willful
> infringement. . . . In addition, if you
> violate copyright law by engaging in file
> sharing, you may be subject to discipline and
> other applicable college policy.

Tenenbaum received handbooks containing similar language during each of his four years at Goucher, but was unfazed and continued.

Tenenbaum also knew the college took this seriously and had itself acted to stop this illegal activity. By the end of his undergraduate studies at Goucher, the school had implemented so many technological restrictions on its network--which he knew were designed to prevent illegal downloading of music files--that peer-to-peer programs "wouldn't work at all."

The Tenenbaums' internet service provider at home in Providence, Cox Communications, also warned against using the internet to illegally infringe copyrighted materials. In 2003, for example, the terms of service they offered to their customers prohibited customers from using the internet service "to post, copy, transmit or disseminate any content that infringes the patents, copyrights, trade secrets, trademarks or proprietary rights of any party." It further provided that "Cox assumes no responsibility, and you assume all risks regarding the determination of whether material is in the public domain or may otherwise be used by you for such purposes."

-15-

In a September 2005 letter, plaintiffs themselves informed Tenenbaum that he had been detected infringing copyrighted materials and notified him that his conduct was illegal. The letter stated: "We are writing in advance of filing suit against you in the event that you have an interest in resolving these claims."[6] The letter urged Tenenbaum to consult with an attorney immediately, and explained that the recording companies were prepared to initiate a legal action against Tenenbaum because of the severe impact of his actions on the industry:

> Copyright theft is not a victimless crime. People spend countless hours working hard to create music -- not just recording artists and songwriters, but also session players, backup singers, sound engineers and other technicians. In addition, the music industry employ thousands of other people, such as CD-plant workers, warehouse personnel, record store clerks and developers of legitimate online music services. They all depend on sale of recordings to earn a living. So do record companies, which routinely invest millions of dollars to discover and sign promising artists, and then to produce and market their recordings. In addition, piracy eats away at the investment dollars available to fund new music and, in effect, erodes the future of music.

The letter also instructed Tenenbaum to preserve any relevant evidence including "the entire library of recordings that you have

---

[6]     Tenenbaum contacted Sony as a result of the letter. While there were some settlement discussions, the parties were unable to resolve the matter.

made available for distribution as well as any recordings you have downloaded . . . ."[7]

The letter from Sony resulted in a conversation between Tenenbaum and his mother regarding his use of peer-to-peer networks. During that conversation, Tenenbaum claimed that it was "impossible . . . to know" who was responsible for the infringements referenced in Sony's letter.

Despite these warnings and his knowledge that he was and had been engaging in illegal activity which could subject him to liability of up to $150,000 per infringement, Tenenbaum continued the illegal downloading and distribution of copyrighted materials until at least 2007--a full two years after receiving the letter from Sony. He stopped his activity only after this lawsuit was filed against him.

Strong evidence established that Tenenbaum lied in the course of these legal proceedings in a number of ways. In his initial responses to Sony's discovery requests, Tenenbaum represented he "had no knowledge or recollection of online media distribution systems used or any dates" of such use. He also denied creating or using the "sublimeguy14@kazaa" account name that

---

[7] After receiving this letter, Tenenbaum nonetheless took his laptop computer for repairs and had its operating system reinstalled and its hard drive reformatted. At trial, Tenenbaum maintained that he only had work done on the computer because "the thing wouldn't run," and that he instructed the computer repairman not to tamper with the music files stored on his computer.

he had used to access various peer-to-peer networks, and he denied any knowledge of whether a peer-to-peer network had been installed on his computer.

At trial, however, Tenenbaum admitted that each of these statements he had made was false. He made numerous admissions in his testimony as to the scope of his conduct from 1999 until 2007. He admitted to installing peer-to-peer networks on his computer, including Kazaa, Limewire, Audio Galaxy, iMesh, and Morpheus, so that he could download and upload music with "the least amount of wasted effort." He admitted that he created the "sublimeguy14@kazaa" user account, downloaded songs from the networks using that account, and placed materials in shared folders on those networks so that other users could download the materials onto their own computers. On some occasions, he believed he was the first person to upload a particular music recording onto the network. He testified that he placed between 600 and 5,000 songs on the Goucher College peer-to-peer network for others to download. He further testified that he also copied illegally downloaded songs onto CDs and USB drives, both for personal use and to give to other individuals. He also explicitly admitted liability for downloading and distributing the thirty sound recordings at issue in the case.

Before the trial, Tenenbaum also attempted to shift responsibility for his conduct to other individuals by claiming they could have used his computer in order to illegally download

and distribute the copyrighted works. These individuals included a foster child living in his family's home, burglars who had broken into the home, his family's house guest, and his own sisters. His sisters and others he blamed testified that they had never illegally downloaded music and had no knowledge of who installed the file sharing software on Tenenbaum's computer.

Finally, when asked at trial about his efforts to attribute the blame for his actions to others, Tenenbaum admitted his own responsibility: "I used the computer, I uploaded, I downloaded music, this is what I did, that's how it is, I did it."

II.

Tenenbaum's Challenges to the Constitutionality
and Applicability of the Copyright Act

Tenenbaum presents three arguments that he is not subject to the Copyright Act. First, Tenenbaum argues that the Copyright Act is unconstitutional under Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340 (1998). Feltner held that the Seventh Amendment entitles a defendant to have a jury determine the amount of statutory damages under § 504(c), although Congress had provided that judges, not juries, would render statutory damage awards. He argues that Feltner somehow renders the statutory damages provision unconstitutional until Congress chooses to amend the statute.

Second, Tenenbaum argues that Congress did not intend the Act to impose either liability or statutory damages where the

-19-

copyright infringements at issue amount to what he calls "consumer copying."

Third, Tenenbaum argues that statutory damages are unavailable to Sony because, in his view, statutory damages, as a matter of Congressional intent, cannot be awarded absent a showing of actual harm, and he claims there was no harm.

We review such legal and constitutional questions de novo. United States v. S. Union Co., 630 F.3d 17, 24 (1st Cir. 2010). None of these arguments has merit.

A. Constitutionality of the Copyright Act After Feltner

Tenenbaum did not clearly make the argument that Feltner renders 504(c) unconstitutional to the district court, and so it is waived. See Dillon v. Select Portfolio Servicing, 630 F.3d 75, 82 (1st Cir. 2011).

Even were the argument not waived, it is both wrong and foreclosed by our circuit precedent. In Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56 (1st Cir. 2000), we considered Feltner's impact on a claim for statutory damages under § 504(c). We held that Feltner required remand to the district court so that a jury could determine both whether the infringements at issue were willful and the proper measure of statutory damages, necessarily rejecting any notion that statutory damages under § 504(c) were no longer available after Feltner. Id. at 63. We followed the same reasoning in Venegas-Hernandez v. Sonolux Records, 370 F.3d 183,

191-94 (1st Cir. 2004) (interpreting and applying § 504(c) after Feltner).

Our sister circuits have likewise concluded that Feltner did not render § 504(c) unconstitutional. See, e.g., BMG Music v. Gonzalez, 430 F.3d 888, 892-93 (7th Cir. 2005) (upholding statutory damages award under § 504(c) despite claim that Feltner rendered such an award unconstitutional); Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc., 259 F.3d 1186, 1192 (9th Cir. 2001) (rejecting argument that Feltner rendered "statutory damages provision of the Copyright Act . . . unconstitutional in its entirety" and concluding Feltner "in no way implies that copyright plaintiffs are no longer able to seek statutory damages under the Copyright Act").

This conclusion is also required by Supreme Court precedent. Where the Court has found a particular federal statute to deprive defendants of jury rights in violation of the Seventh Amendment,[8] the Court has deemed the offending portions of the statute inoperative while leaving the statute otherwise intact.

_____

[8] It is also clear that Congress continues to intend that the Copyright Act be fully operational as to statutory damages after Feltner. Congress amended § 504(c) after the Supreme Court had decided Feltner. See Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, 113 Stat. 1774 (amendment increasing the statutory damage boundaries). "Congress is presumed to be aware of . . . [a] judicial interpretation of a statute and to adopt that interpretation if it re-enacts a statute without change." Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2492 (2009) (quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)).

-21-

See, e.g., Tull v. United States, 481 U.S. 412, 417 n.3 (1987) (upholding enforceability of Clean Water Act even though "[n]othing in the language of the . . . Act or its legislative history implies any congressional intent to grant defendants the right to a jury trial" and the Seventh Amendment required that defendants be given such a jury trial right).

B.    The Copyright Act and "Consumer-Copier" and Publisher-Copier Copyright Infringement

Tenenbaum argues to us that Congress never intended for the Copyright Act to impose liability or statutory damages against what he calls "consumer copiers." That argument was not presented to the district court and is waived.[9]

Even were the argument not waived, it must fail. We start with the inaccuracy of the labels that Tenenbaum's argument uses. Tenenbaum is not a "consumer-copier," a term he never clearly defines. He is not a consumer whose infringement was merely that he failed to pay for copies of music recordings which he downloaded for his own personal use. Rather, he widely and repeatedly copied works belonging to Sony and then illegally distributed those works to others, who also did not pay Sony. Further, he received, in turn, other copyrighted works for which he

---

[9]    Although in the district court Tenenbaum raised the argument that the Copyright Act does not extend to consumer conduct as a reason why the jury's statutory damage award should be reduced, he did not present the argument, as he does here, as a basis to exempt his actions from liability altogether.

did not pay.  Nor can Tenenbaum assert that his was merely a "non-commercial" use and distribution of copyrighted works as those terms are used elsewhere in the Act.[10]  His use and distribution was for private gain and involved repeated and exploitative copying.

Our analysis begins with the language of the Act, which we "construe . . . in its context and in light of the terms surrounding it."  Succar v. Ashcroft, 394 F.3d 8, 23 (1st Cir. 2005) (quoting Leocal v. Ashcroft, 543 U.S. 1, 9 (2004)) (internal quotation marks omitted).  "It is well established that, when the statutory language is plain, we must enforce it according to its terms."  Jimenez v. Quarterman, 555 U.S. 113, 118 (2009).

In addition to the factual inaccuracy of his labels, Tenenbaum's argument that the Copyright Act immunizes his conduct from liability is contradicted by the plain language of the statute.  The Copyright Act does not make the distinctions he urges between "consumer" and "non-consumer" infringement of copyrighted

---

[10]    In the criminal infringement context, Congress has extended liability to, inter alia, those who infringe "for purposes of commercial advantage or private financial gain."  17 U.S.C. § 506.  Congress has made it clear, however, that this designation applies even absent direct monetary profit.  See 17 U.S.C. § 101. It has defined "financial gain" to include "receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works."  Id.
        Under the "fair use" exception, which is not available to Tenenbaum, what constitutes a commercial use has also been interpreted broadly.  See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1015 (9th Cir. 2001) ("Direct economic benefit is not required to demonstrate a commercial use. Rather, repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use.").

-23-

materials by copying and distribution. Instead, the Act renders those, like Tenenbaum, who use or distribute a copyrighted work without authorization liable in copyright. Indeed, the Act does not use the term "consumer" at all, much less as a term excluded from the category of infringers. Rather, the statute refers to "anyone" as potential infringers. 17 U.S.C. § 501(a).

The Act explicitly grants owners of "works of authorship"[11] exclusive rights to, inter alia, "reproduce the copyrighted work in copies or phonorecords" and "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. By the plain language of § 106, copyright owners, like Sony, have the exclusive right to reproduce copyrighted works in copies or phonorecords and to distribute those copies or phonorecords.

The Copyright Act contains no provision that could be interpreted as precluding a copyright owner from bringing an action against an infringer solely because the infringer was a consumer of

---

[11] Sound recordings constitute "works of authorship" that receive copyright protection. See 17 U.S.C. § 102(a)(7).

Tenenbaum implies that digital media should be treated differently than conventional music recordings. However, 17 U.S.C. § 102(a) makes no such distinction, and in fact explicitly provides that copyright protection exists "in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." (Emphasis added).

the infringed products or acted with a so-called noncommercial purpose in his distribution of the works to others. Apart from the reality that the facts of record support neither characterization, 17 U.S.C. § 501(a) provides that "anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright." (Emphasis added). Further, under 17 U.S.C. § 501(b), "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." (Emphasis added). Had Congress intended to limit copyright actions against so-called "consumer infringers" as Tenenbaum hypothesizes, it easily could have done so. See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 227-28 (2008). Instead, subject to exceptions not relevant here, it extended liability to "anyone" who violates a copyright owner's exclusive rights and allowed those owners to pursue actions against "any infringement." 17 U.S.C. § 501 (emphasis added).

Moving from liability to damages, Tenenbaum's argument that statutory damages are not available here is also refuted by the plain statutory language. Section 504 provides that "an infringer of copyright is liable for either . . . the copyright owner's actual damages and any additional profits of the infringer . . . or statutory damages." (Emphasis added). The statute does

not condition the availability of either set of damage calculations on whether the offending use was by a consumer or for commercial purposes or not.

Congress drew distinctions in the Copyright Act where it meant to do so. For example, it distinguished between willful and non-willful infringements, subjecting willful infringers to a higher cap on statutory damage awards. See 17 U.S.C. § 504(c).

Where Congress wanted the Act to draw distinctions based on the nature of the use it also did so explicitly, such as with the fair use defense. See 17 U.S.C. § 107 (providing for fair use limitation on owner's exclusive rights and identifying the "purpose and character of the use" including "whether such use is of a commercial nature or is for nonprofit educational purposes" as a factor to consider in determining applicability of fair use limitation).[12]

Further, where Congress intended to create other exceptions for solely personal or non-commercial use, it did so expressly. In two amendments which do not apply here, it drew such distinctions: (1) the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391, which fully extended federal copyright protections to sound recordings but exempted certain reproductions of sound recordings made for personal use, and (2) the Audio Home

---

[12] Tenenbaum does not claim on appeal that his conduct falls under the fair use doctrine.

Recording Act of 1992 (AHRA), Pub. L. No. 102-563, 106 Stat. 4237, codified at 17 U.S.C. § 1001 et seq., which provided some exemptions in other situations from copyright liability for infringements "based on the noncommercial use by a consumer."[13] 17 U.S.C. § 1008.[14] These statutes refute Tenenbaum's argument.

Because Congress has enumerated a set of express exceptions, rules of statutory interpretation instruct that Congress intended to make no other exceptions than those specified. See Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 (1978) (finding under maxim expressio unius est exclusio alterius that enumerated exceptions are the sole exceptions intended within the Endangered Species Act); see also Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting

---

[13]    See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 430 n.11 (1984) (declining to express an opinion on scope of 1971 Act's exceptions for noncommercial uses).

[14]    To take the point further, although the AHRA created immunity for some unauthorized, noncommercial uses of copyrighted materials, Congress explicitly declined to extend immunity to individuals who use home computers to copy copyrighted materials. See 17 U.S.C. § 1001(3); see also Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1078 (9th Cir. 1999) ("Under the plain meaning of the [AHRA's] definition of digital audio recording devices, computers (and their hard drives) are not digital audio recording devices because their 'primary purpose' is not to make digital audio copied recordings.").

-27-

<u>United States</u> v. <u>Wong Kim Bo</u>, 472 F.2d 720, 722 (5th Cir. 1972))
(internal quotation marks omitted).

The clarity of the statutory text compels the rejection
of Tenenbaum's arguments.  When a statute speaks with clarity to an
issue, "judicial inquiry into the statute's meaning, in all but the
most extraordinary circumstance, is finished." <u>Estate of Cowart</u> v.
<u>Nicklos Drilling Co.</u>, 505 U.S. 469, 475 (1992).  It is not within
the province of the courts to rewrite Congressional statutes: that
task is "for Congress to accomplish by further legislation."
<u>United States</u> v. <u>Harriss</u>, 347 U.S. 612, 620 (1954); <u>see</u> <u>also</u> <u>Logan</u>
v. <u>United States</u>, 552 U.S. 23, 26-27 (2007) (refusing to stray from
statutory text).

Asking us to ignore the text and the plain meaning of the
statute, Tenenbaum argues Congress was unaware that suits like this
could be brought and so could not have intended the statute to
apply here.  The argument is wrong both on the law and on the
facts.

Congress did contemplate that suits like this were within
the Act.  Congress last amended the Copyright Act in 1999 to
increase the minimum and maximum awards available under § 504(c).
<u>See</u> Digital Theft Deterrence and Copyright Damages Improvement Act
of 1999, Pub. L. No. 106-160, 113 Stat. 1774.  At the time,
Congress specifically acknowledged that consumer-based,
noncommercial use of copyrighted materials constituted actionable

copyright infringement. Congress found that "copyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced technologies," and cautioned that "the potential for this problem to worsen is great." H.R. Rep. No. 106-216, at 3 (1999). Indeed, the legislative history directly addresses this concern:

> By the turn of the century the Internet is projected to have more than 200 million users, and the development of new technology will create additional incentive for copyright thieves to steal protected works. The advent of digital video discs, for example, will enable individuals to store far more material than on conventional discs and, at the same time, produce perfect secondhand copies. . . . Many computer users are either ignorant that copyright laws apply to Internet activity, or they simply believe that they will not be caught or prosecuted for their conduct. Also, many infringers do not consider the current copyright infringement penalties a real threat and continue infringing, even after a copyright owner puts them on notice that their actions constitute infringement and that they should stop the activity or face legal action. In light of this disturbing trend, it is manifest that Congress respond appropriately with updated penalties to dissuade such conduct. H.R. 1761 increases copyright penalties to have a significant deterrent effect on copyright infringement.

Id.[15]

---

[15] Tenenbaum argues that the 1999 Amendment pre-dated the widespread use of peer-to-peer networking sites, and observes that the 1999 Digital Theft Deterrence Act was first introduced in May 1999, a full month before the launch of Napster's file sharing network. Again, the factual premise is wrong. The Act was not signed into law until December 1999, at which point Napster was itself operational.

Even earlier, in 1997, Congress had explicitly amended the criminal component of the Copyright Act to make clear that criminal liability for copyright infringement can be imposed even if an infringer's use of a copyrighted material is noncommercial. See No Electronic Theft Act (NET Act), Pub. L. No. 105-147, 111 Stat. 2678. The NET Act was enacted in response to United States v. LaMacchia, 871 F. Supp. 535 (D. Mass. 1994), in which a court had barred prosecution of a student charged with wire fraud because even though he enabled others to download copyrighted software applications at no cost, he received no commercial gain from his activities and the criminal statute precluded prosecution where there was no commercial benefit conferred.

Congress made clear that it enacted the NET Act to "criminalize[] computer theft of copyrighted works, whether or not the defendant derives a direct financial benefit from the act(s) of misappropriation, thereby preventing such willful conduct from destroying businesses, especially small businesses, that depend on licensing agreements and royalties for survival." H.R. Rep. 105-339, at 5 (1997).

---

Moreover, Congress had in 1997 already acknowledged the advent of "audio-compression" technologies that "permit[] infringers to transmit large volumes of CD-quality music over the internet" in enacting the No Electronic Theft Act, Pub. L. No. 105-147, 111 Stat. 2678. See H.R. Rep. No. 105-339, at 4 (1997).

Tenenbaum's argument that we may ignore the plain language of the statute and Congressional intent because relatively few lawsuits were brought against those in his position also goes nowhere. Again, both the factual and legal contentions are wrong.

Even if we assume that copyright owners have historically chosen first to litigate against the providers of new technologies of reproduction and dissemination rather than the users of those new technologies, see Tussey, Technology Matters: The Courts, Media Neutrality, and New Technologies, 12 J. Intell. Prop. L. 427 (2005), that may best be explained by the owners using a cost-benefit analysis, and says nothing about Congressional intent. Historically, the costs of prosecuting infringement actions against individual users could be thought by owners to have exceeded the benefits. That the copyright owners have turned to litigation against individual infringers only underscores that the balance of the copyright holder's cost-benefit analysis has been altered as peer-to-peer networks and digital media become more prevalent.

In any event, the argument is legally irrelevant. The Supreme Court has expressly instructed that courts apply the Copyright Act to new technologies. In Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984), the Court instructed that courts must "[a]pply[] the copyright statute, as it now reads, to the facts as they have been developed" even though Congress might ultimately "take a fresh look at this new

-31-

technology, just as it so often has examined other innovations in the past." Id. at 456.

The Supreme Court has made clear that it is particularly important for courts to take this tack when faced with novel Copyright Act issues. "[F]rom its beginning, the law of copyright has developed in response to significant changes in technology," and as "new developments have occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary." Id. at 430-31. We reject Tenenbaum's invitation to usurp Congress's legislative authority and to disregard binding Supreme Court precedent.

C.        Statutory Damages under 17 U.S.C. § 504 and Actual Harm

Tenenbaum next argues that the statutory damages provision is nonetheless inapplicable because, in his view, as a matter of law there can be no statutory damages where "harm caused by a particular defendant has not been proved." Again, he is wrong both as a matter of law and on the facts of record.

The district court properly rejected Tenenbaum's proffered interpretation of § 504. Section 504 clearly sets forth two alternative damage calculations a plaintiff can elect: actual damages and statutory damages. See 17 U.S.C. § 504(a) (providing that "an infringer of copyright is liable for either . . . the copyright owner's actual damages and any additional profits of the infringer . . . or statutory damages") (emphasis added).

Under § 504(b), a plaintiff may elect to receive "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."

Alternatively, under § 504(c), "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work." (Emphasis added). The statute makes clear that statutory damages are an independent and alternative remedy that a plaintiff may elect "instead of actual damages."

Section 504's text reflects Congress's intent "to give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits." Douglas v. Cunningham, 294 U.S. 207, 209 (1935). The Supreme Court explained that before statutory damages were available, plaintiffs, "though proving infringement," would often be able to recover only nominal damages and the "ineffectiveness of the remedy encouraged willful and deliberate infringement." Id. The Supreme Court has since reaffirmed that "[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." F.W.

-33-

<u>Woolworth Co.</u> v. <u>Contemporary Arts</u>, 344 U.S. 228, 233 (1952) (upholding statutory damage award of $5,000 for infringement even when actual damages of only $900 were demonstrated); <u>see</u> <u>also</u> <u>L.A. Westermann Co.</u> v. <u>Dispatch Printing Co.</u>, 249 U.S. 100, 106 (1919) (finding the language chosen by Congress "shows that something other than actual damages is intended--that another measure is to be applied in making the assessment").[16]

Tenenbaum's argument also rests on the faulty assertion that Sony did not offer evidence of the harm it suffered as a result of Tenenbaum's conduct. Tenenbaum downloaded the thirty copyrighted works at issue and distributed those works to innumerable network users. Sony presented extensive testimony regarding the loss in value of the copyrights at issue that resulted from Tenenbaum's conduct, and the harm of Tenenbaum's actions to itself and the recording industry, including reduced income and profits, and consequent job loss to employees.

III.

<u>Tenenbaum's Challenges to the Jury Instructions</u>

Tenenbaum challenges the district court's jury instructions on several grounds, all but one of which were not preserved for appeal, and all of which fail.

---

[16] The statute at issue in <u>L.A. Westermann Co.</u> v. <u>Dispatch Printing Co.</u>, 249 U.S. 100 (1919), contained the phrase "in lieu of actual damages." By contrast, 17 U.S.C. § 504(c) provides that statutory damages are available "instead of actual damages and profits." The point is the same.

We review preserved challenges to jury instructions de novo, and "look to the challenged instructions in relation to the charge as a whole, 'asking whether the charge in its entirety--and in the context of the evidence--presented the relevant issues to the jury fairly and adequately.'" Kennedy v. Town of Billerica, 617 F.3d 520, 529 (1st Cir. 2010) (quoting Goodman v. Bowdoin Coll., 380 F.3d 33, 47 (1st Cir. 2004)). Even if the instructions were erroneous, we reverse only if the error "is determined to have been prejudicial based on a review of the record as a whole." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 72 (1st Cir. 2009).

Absent adequate objections to the instructions, our review is for plain error, which requires that Tenenbaum show (1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness, integrity or public reputation of the judicial proceedings. Gray v. Genlyte Grp., Inc., 289 F.3d 128, 134 (1st Cir. 2002); Estate of Keatinge v. Biddle, 316 F.3d 7, 16 (1st Cir. 2002). "The standard is high, and 'it is rare indeed for a panel to find plain error in a civil case.'" Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 36 (1st Cir. 2006) (quoting Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam)).

A.  Tenenbaum's Preserved Challenge to the District Court's Instruction as to the Statutory Damage Range Under § 504(c)

Tenenbaum's only preserved instructional challenge is that the district court erred by instructing the jury about the range of statutory damages available to Sony under § 504(c).[17] The district court instructed the jury that "[t]he Copyright Act entitles a plaintiff to a sum of not less than $750 and not more than $30,000 per act of infringement (that is, per sound recording downloaded or distributed without license) as you consider just." The court further instructed: "If you find that the defendant's infringement of a copyrighted work was willful, the Copyright Act entitles a plaintiff to a sum of not less than $750 and not more than $150,000 per act of infringement (that is, per sound recording downloaded or distributed without license), as you consider just." The court then instructed as to a set of non-exhaustive factors that the jury might wish to consider in issuing its award, including:

> the nature of the infringement; the defendant's purpose and intent, the profit that the defendant reaped, if any, and/or the

_____

[17]  The statutory damage range was also set forth on the jury verdict form. "District courts have 'considerable discretion about the formulation, nature, and scope of the issues' on a special verdict form." Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010) (quoting 9B Wright, Miller & Kane, Federal Practice and Procedure § 2506, at 119 (2d ed. 1995)). Because we conclude that the district court did not err in instructing the jury of the statutory damage range under § 504(c), Tenenbaum's like challenge to the jury verdict form also fails.

> expense that the defendant saved; the revenue lost by the plaintiff as a result of the infringement; the value of the copyright; the duration of the infringement; the defendant's continuation of infringement after notice or knowledge of copyright claims; and the need to deter this defendant and other potential infringers.

Tenenbaum does not object to that portion of the instructions.

Tenenbaum argues that the statutory damage range should not have been disclosed to the jury and that the instructions presented the statutory damage range "unmoored from the overall statutory scheme and the context of other cases." Tenenbaum proposes that instead the district court should only have instructed the jury to return an award the jury deemed "just" and then the court should have adjusted the award to fall within the statutory range after the jury made its determination. This argument is, of course, at considerable tension with Tenenbaum's argument that damages within the statutory range are unconstitutional.

The instruction given as to the statutory damage range was an accurate statement of the law and clearly informed the jury of the range of damages it could award under § 504(c). As such there was no error. See United States v. Mardirosian, 602 F.3d 1, 10 (1st Cir. 2010) (upholding jury instructions because they "provided a clear, accurate description of the substantive law").

It is commonplace for courts to explicitly instruct juries of the maximum and minimum statutory damage awards permitted

under § 504(c).  See, e.g., In re Frye, No. 08-1055, 2008 WL 8444822, at *3 (B.A.P. 9th Cir. Aug. 19, 2008) (noting jury awarded the statutory maximum under § 504(c)); Yurman Design, Inc. v. PAJ, Inc., 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000) (noting plaintiff elected to seek statutory damages, "and the jury was provided instructions concerning such damages"), *rev'd in part on other grounds*, 262 F.3d 101 (2d Cir. 2001).  Several model federal jury instructions also explicitly enumerate the range of statutory damages under 504(c).  See, e.g., 3B K. O'Malley, J. Grenig & W. Lee, Federal Jury Practice and Instructions--Civil § 160.93 (5th ed. 2011) (including within model the instruction that "plaintiff . . . has elected to recover 'statutory damages' instead of plaintiff's actual damages and profits" and that "[u]nder the Copyright Act, plaintiff . . . is entitled to a sum of not less than $750 or more than $30,000 as you consider just"); Ninth Circuit Manual of Model Civil Jury Instructions § 17.25 (including within model the instruction that the "amount you may award as statutory damages is not less than $750, nor more than $30,000 for each work you conclude was infringed"); Holbrook & Harris, ABA Model Jury Instructions: Copyright, Trademark, and Trade Dress Litigation § 1.7.7 (2008) (same).  Each set of model jury instructions also notes that the maximum statutory damage award under § 504(c) is increased if the defendant's copyright infringement is determined to be willful.  Cf. Fraser v. Major

-38-

League Soccer, L.L.C., 284 F.3d 47, 62 (1st Cir. 2002) (noting that district court's instructions tracked ABA model jury instructions in rejecting objection to instructions).

There is no viable argument that the instruction violated Congressional intent. Where Congress has sought to prevent juries from knowing that their awards will be reduced to be within statutory caps, it has explicitly said so in the relevant statute. See, e.g., 42 U.S.C. § 1981a(c)(2) (providing that "the court shall not inform the jury of the limitations" on awards of damages in intentional employment discrimination cases under Title VII). There is no such prohibition here.

Tenenbaum nonetheless argues that because Congress initially enacted the statute on the understanding that judges, not juries, would award statutory damages, it must be error to tell the jury what the limits are.[18] He also argues that the Supreme Court "failed to provide any structure for guiding the jury's use of the wide power shifted to it" within its holding in Feltner that the Seventh Amendment entitles a defendant to have a jury determine the amount of § 504(c) damages. Feltner, however, raises no objection to a jury's being informed of the statutory range. In any case, this argument is simply a variant of Tenenbaum's claim that Feltner

---

[18] Citing psychological studies but not law, Tenenbaum argues that informing the jury of the statutory damage range was reasonably likely to have had an "anchoring effect" that erroneously skewed the jury's award determination.

somehow renders § 504(c) inoperable, which we have already rejected.

Moreover, after Feltner, had Congress wished to prevent juries from being informed of the bottom and top ranges of permissible statutory damages, it easily could have done so. Instead, Congress amended the statute after Feltner to expand the range of damages, and did so without placing any limitation as to how courts should instruct juries in such cases. See Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, 113 Stat. 1774.

The district court's instructions on the range of statutory damages were not erroneous, let alone prejudicial.

B.      Tenenbaum's Remaining Challenges to the Jury Instructions

Tenenbaum raises a series of unpreserved additional objections to the jury instructions which we review for plain error.

1.      The Unpreserved Challenge that the District Court Should Have First Determined then Instructed the Jury on the Court's Assessment of Constitutional Limits on the Award

Tenenbaum argues that the district court erred by only instructing the jury as to the statutory boundaries for the damages award and failing, sua sponte, to inform the jury of the constitutional boundaries for the award. Tenenbaum asked for no such instruction, and the argument is waived. Even had the argument not been waived, there was no error.

-40-

Inherent in his argument is the proposition that before a case goes to the jury, the trial court must make its own assessment of the constitutional limits on damages and so instruct the jury. That is exactly backwards. See St. Louis, I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919) (considering constitutional limits on statutory damage award after jury issued award). Tenenbaum's proposal itself could raise Seventh Amendment concerns about judicial usurpation of the jury's function. There was no error.

2. The Unpreserved Argument that the District Court Was Required to Instruct the Jury Not to Consider Injury Suffered by Other Recording Companies or Injuries Caused by Copyright Infringers Other Than Tenenbaum

The district court properly instructed the jury on Tenenbaum's conduct and the plaintiffs' harms the jury could consider in making its determination. It specifically listed the nature of Tenenbaum's infringement, Tenenbaum's purpose and intent, the "revenue lost by the plaintiff as a result of the infringement," the duration of the infringement, and the defendant's continuation of infringement after learning of the copyright claims.

Tenenbaum argues that the district court sua sponte should have provided additional instruction to focus the jury. Again, the argument is waived. Even were it not waived, the court did not err. Tenenbaum appears to be arguing that the jury also

had to be told it could not consider damages resulting from the illegal downloading and distribution of copyrighted materials suffered by other recording companies besides the named plaintiffs or from other unrelated filesharing by others.[19] This is a hypothetical concern, not a real one in this case.

Tenenbaum purports to rely on language in <u>Philip Morris USA</u> v. <u>Williams</u>, 549 U.S. 346, 357 (2007), that where there is a significant risk that the jury might take into account harm caused to non-party victims by the defendant, "a court, <u>upon request</u>, must protect against that risk." (Emphasis added). Tenenbaum made no such request to the trial court.[20] Nor does he point to any

---

[19] He argues that because Sony offered testimony regarding the harmful effects all filesharing, not just Tenenbaum's infringements, has had on the recording industry at large, and not only the named plaintiffs, the court was required to instruct the jury sua sponte to "consider only harms <u>by</u> the named defendant that flowed <u>to</u> the named plaintiffs."

[20] Tenenbaum has twice waived this argument. First, we reject his assertion that he preserved it by offering the following proposed jury instructions: "While there may be evidence relating to other downloading and sharing, the only issue of infringement or fair use that is before you concerns these . . . songs . . . . [Y]ou may only award damages, if any, as to those . . . songs." This did not inform the court that Tenenbaum sought an instruction regarding harm done by other infringers or suffered by other recording companies given that <u>Tenenbaum</u> engaged in other downloading and sharing beyond the thirty songs at issue. <u>See</u> <u>Linn</u> v. <u>Andover Newton Theological Sch., Inc.</u>, 874 F.2d 1, 5 (1st Cir. 1989) ("If there is a problem with the instructions, the judge must be told <u>precisely</u> what the problem is, and as importantly, what the attorney would consider a satisfactory cure.")
Moreover, after the court gave the jury its instructions, Tenenbaum raised no objection on these grounds whatsoever. "[E]ven if the initial <u>request</u> is made in detail, the party who seeks but did not get the instruction must object <u>again</u> after the

-42-

authority that requires a court to provide a <u>Philip Morris</u>-type instruction sua sponte.

<u>Philip Morris</u> does not help him, in any event. There was not a substantial risk of the jury's going astray. The court's entirely correct instruction foreclosed that risk. The jury was never urged to consider damages (1) caused by other copyright infringers or (2) suffered by other recording companies. Indeed, in his closing argument, Tenenbaum's counsel made clear that "it's what Joel did that is here in issue and [the question is] what's appropriate in response to what Joel did," and Sony's counsel likewise stated that applying damages for "what Joel did" was "exactly what we want you to do." The court's jury instructions as a whole focused exclusively on Tenenbaum's actions and the resulting harm to the plaintiffs.

3.     <u>The Unpreserved Argument that the District Court Was Sua Sponte Required to Additionally Instruct that Statutory Damages Could Not Be Awarded Unless They Were Related to Actual Damages</u>

The district court did instruct the jury to issue an award within the statutory range that it deemed to be just, and highlighted a number of factors it could use for guidance. Tenenbaum argues that the district court erred by failing, sua sponte, to add an additional instruction that as a matter of law

---

instructions are given but before the jury retires for deliberations." <u>Gray</u> v. <u>Genlyte Grp., Inc.</u>, 289 F.3d 128, 134 (1st Cir. 2002).

statutory damages cannot be awarded unless reasonably related to actual damages.

Tenenbaum's argument fails the first step of the plain error analysis. His proposed instruction itself would have been error. In § 504, Congress drew a plain distinction between actual and statutory damages, making it clear that the availability of statutory damages is not contingent on the demonstration of actual damages. See 17 U.S.C. § 504. Statutory damages are available even for "uninjurious and unprofitable invasions of copyright." F.W. Woolworth Co., 344 U.S. at 233.

We join our sister circuits, who have rejected similar objections to jury instructions. See New Form, Inc. v. Tekila Films, Inc., 357 F. App'x 10, 11-12 (9th Cir. 2009) ("There is no required nexus between actual and statutory damages under 17 U.S.C. § 504(c)."); Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 496-97 (4th Cir. 1996); see also Lowry's Reports, Inc. v. Legg Mason, Inc., 302 F. Supp. 2d 455, 460 (D. Md. 2004) (rejecting argument that court should have instructed the jury "that the amount of statutory damages should bear a reasonable relationship to actual damages").

4.     <u>The Unpreserved Argument that the District Court</u>
       <u>Erred in Instructing the Jury that Finding Willful</u>
       <u>Infringement Under § 504 Only Requires a Finding</u>
       <u>that a Defendant Knowingly Infringed Copyrighted</u>
       <u>Materials</u>

Finally, Tenenbaum challenges the district court's instruction that "willful infringement" "means that a defendant had knowledge that his actions constituted copyright infringement or acted with reckless disregard for the copyright holder's rights." The argument is wrong and is based on a misreading of the statute.

Tenenbaum argues that, as used in § 504, a "willful infringement" must require more than a showing that the defendant had knowledge his actions constituted copyright infringement. He argues this must be so because non-willful infringement itself requires the defendant to have had such knowledge. As a result, merely requiring that an infringement be "knowing" to be "willful" would eliminate the distinction between non-willful and willful infringements that Congress sought to create in enacting § 504.

Tenenbaum's argument rests on the false premise that knowledge is an element of non-willful copyright infringement under the Copyright Act. To the contrary, the Act contains no requirement that a particular violation of copyright be knowing to constitute a non-willful infringement.[21]  See 17 U.S.C. § 501; see

---

[21]     17 U.S.C. § 504(c)(2)'s so-called "innocent infringement" provision does not lend support to Tenenbaum's theory that knowledge is an element for non-willful infringement under the Act. A defendant cannot prove that he or she qualifies for a reduction of damages under § 504(c)(2) merely by showing that he or she

-45-

also <u>Fitgerald Publ'g Co.</u> v. <u>Baylor Publ'g Co.</u>, 807 F.2d 1110, 1113 (2d Cir. 1986) ("Under § 501(a) intent or knowledge is not an element of infringement.").

We join our sister circuits who have unanimously and routinely found that an infringement is willful under § 504 if it is "knowing." <u>See</u>, <u>e.g.</u>, <u>Bridgeport Music, Inc.</u> v. <u>UMG Recordings, Inc.</u>, 585 F.3d 267, 278 (6th Cir. 2009) (rejecting challenge to jury instruction that, under § 504(c), "[a]n infringement is willful when a defendant engaged in acts that infringed a copyright and knew that those actions may infringe the copyright") (alteration in original); <u>Zomba Enters., Inc.</u> v. <u>Panorama Records, Inc.</u>, 491 F.3d 574, 584 (6th Cir. 2007); <u>Lyons P'ship, L.P.</u> v. <u>Morris Costumes, Inc.</u>, 243 F.3d 789, 799-800 (4th Cir. 2001). <u>Cf.</u> <u>Yurman Design, Inc.</u>, 262 F.3d at 111 (finding plaintiff is "not required to show that the defendant had knowledge that its actions constitute[d] an infringement" for infringement to be willful under § 504(c) so long as defendant recklessly disregarded the risk of infringement)(citation omitted)(internal quotation marks omitted).

The district court correctly instructed the jury. There was no error as to the finding of liability against Tenenbaum.

---

lacked knowledge that his or her actions constituted copyright infringement. Rather, a plaintiff may still recover the full measure of statutory damages available for non-willful infringement even against an <u>unknowing</u> infringer if the infringer had "<u>reason to believe</u> that his or her acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2) (emphasis added).

-46-

IV.

<u>The District Court's Bypassing of Common Law Remittitur and
Reducing the Award on Disputed Constitutional Grounds</u>

After handling the trial with great skill, the district court committed reversible error when, after the jury awarded statutory damages, it bypassed the issue of common law remittitur, and instead resolved a disputed question of whether the jury's award of $22,500 per infringement violated due process, and decided itself to reduce the award. The court declined to adhere to the doctrine of constitutional avoidance on the ground that it felt resolution of a constitutional due process question was inevitable in the case before it. A decision on a constitutional due process question was not necessary, was not inevitable, had considerable impermissible consequences, and contravened the rule of constitutional avoidance. That rule had more than its usual import in this case because there were a number of difficult constitutional issues which should have been avoided but were engaged.

Facing the constitutional question of whether the award violated due process was not inevitable. The district court should first have considered the non-constitutional issue of remittitur, which may have obviated any constitutional due process issue and attendant issues. Had the court ordered remittitur of a particular amount, Sony would have then had a choice. It could have accepted the reduced award. Or, it could have rejected the remittitur, in

which case a new trial would have ensued.  See 11 Wright, Miller &
Kane, Federal Practice and Procedure § 2815, at 160 (2d ed. 1995).

In reaching and deciding that due process constitutional
question, the district court also unnecessarily decided several
related constitutional issues.  The court determined that the
statutory damage award was effectively a punitive damage award for
due process purposes and applied the factors set forth in BMW v.
Gore, 517 U.S. 559 (1996), to assess its constitutionality.  The
court declined to apply the Williams standard the Supreme Court had
previously applied to statutory damage awards.  See Tenenbaum, 721
F. Supp. 2d at 103.  The district court's tack also led to
unnecessary resolution of Seventh Amendment issues.  The decision
to reduce the jury's award without offering Sony a new trial
implicitly presupposed that, in reducing a statutory damage award
issued by a jury, a court need not offer plaintiffs the option of
a new jury trial in order to comport with the Seventh Amendment.

The United States, concerned with defending the
constitutionality of the Copyright Act and its statutory damage
provision, argues that the district court erred by unnecessarily
reaching Tenenbaum's constitutional challenge to the award and
bypassing the question of common law remittitur.[22]  The United

---

[22]  On appeal, both Tenenbaum and Sony argue error, but
neither challenges the district court's decision to bypass the
question of common law remittitur.  They instead focus on whether
the court chose the correct due process standard to evaluate
whether the award was so excessive as to violate the constitution.

States alternatively argues that, if the due process issue were reached, the district court was required to apply the Williams due process standard. The United States points out an inferior federal court may not displace the Supreme Court's on point holding. The United States also raises Seventh Amendment concerns.

We agree with the position of the United States that the district court erred when it prematurely reached a constitutional question of whether the jury's award was excessive so as to violate due process. We reverse the reduction of the award, reinstate the original jury verdict and award, and remand for consideration of the common law remittitur question.

A.        District Court Damages Proceedings

We provide a more detailed review of the relevant district court proceedings.

After the jury verdict awarding Sony $22,500 per infringement, Tenenbaum filed a motion for a new trial or remittitur pursuant to Federal Rule of Civil Procedure 59. Absent a grant of a new trial, he sought remittitur to the statutory minimum. Tenenbaum argued the court should use the standard that remittitur is appropriate where the result of the award is "grossly

_____

Tenenbaum argues the Gore factors provide the correct due process analysis and that even the reduced award violates due process under that standard. Sony argues that the Williams due process standard must apply, that under it the original award issued by the jury never violated due process, and that the district court erred in reducing the award.

-49-

excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Correa v. Hosp. S.F., 69 F.3d 1184, 1197 (1st Cir. 1995) (quoting Segal v. Gilbert Color Sys., Inc., 746 F.2d 78, 81 (1st Cir. 1984)) (internal quotation marks omitted). Tenenbaum separately argued the award was unconstitutionally excessive under the standard for reviewing punitive damage awards articulated in Gore.

Sony opposed, arguing there was no factual basis for a remittitur given both the evidence and that the evidence had to be taken in the light most favorable to the prevailing party. See E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 502 (1st Cir. 1994). It also argued that the district court lacked authority to displace a jury verdict which was in the statutory range set by Congress and that to hold otherwise would violate the Seventh Amendment. With regard to Tenenbaum's due process arguments, Sony argued that Williams set forth the proper standard, and not Gore. Sony also argued that under either the Williams or Gore standards, the award was not unconstitutionally excessive.

The United States took a different approach. It took no position on whether Tenenbaum had met the standard for remittitur (or a new trial). Rather, the United States stated that the canon of constitutional avoidance required the district court to first

consider the question of common law remittitur, regardless of whether the award merited remittitur or not. If the court did address the constitutional question, the United States argued that the standard set forth in Williams was appropriate and that the court should reject the Gore guideposts for assessing punitive damages because punitive damages are a distinct remedy from statutory damages. The United States also took the position that an award within the Copyright Act's statutory damage range comported with due process.

At the hearing on Tenenbaum's motion, the court asked counsel for plaintiffs to hypothesize as to what his clients' position would be if the court were to order a reduction or remittitur of the award. Understandably, plaintiffs' counsel did not take a firm position; he said his clients would have to consider the amount and other factors but thought it unlikely such a remittitur would be acceptable. If there were a remittitur, then, he said, the court could not reach the due process question of an excessive award because to do so would deprive plaintiffs of their Seventh Amendment right to a jury trial. Plaintiffs also argued that on the evidence, there was no basis for remittitur.

At that hearing, the United States repeated its position that the court was required to decide the remittitur question first in order to avoid any constitutional issues and that if plaintiffs rejected remittitur, the remedy was a new trial; the court could

not go on to decide a constitutional due process issue as to the award.  If the court did decide a constitutional due process issue as to the excessiveness of the award, the government argued, it was required to apply Williams, which had not been overruled.

Rejecting the position of the United States, the court bypassed remittitur, reached a constitutional due process issue, and ruled the award excessive under Gore.  It reduced the award from $675,000 to $67,500 and did not give plaintiffs the option of a new trial.

The court stated its reason for bypassing the decision on common law remittitur.  It treated plaintiffs' statements at the hearing as foreclosing any possibility of plaintiffs accepting remittitur, regardless of what amount the court might set for the award and despite plaintiffs' stated and careful reservations on the point.  See Tenenbaum, 721 F. Supp. 2d at 88.  From this, the court reasoned that a new trial was inevitable; it then assumed that a jury would inevitably award a damages sum which would lead Tenenbaum to again raise a constitutional excessiveness challenge, and that the court which heard the new trial would then have to consider those and other objections again.[23]  Id.  From these

_____

[23]  These reasons are based on assumptions, not facts.  Sony could not have decided its course of action if remittitur were allowed unless it knew the amount.  Further, if Sony chose a new trial on damages, no one knows what sum a new jury would award, or whether that award would be challenged as excessive.

assumptions, the court reasoned it might as well decide those issues then and there.[24]  Id.

B.          The District Court Erred by Unnecessarily Reaching and Deciding the Question of Whether the Jury's Award Was Unconstitutionally Excessive

The principle of constitutional avoidance, rooted in Article III as well as in principles of judicial restraint, and in this case implicating the Due Process Clause and the Seventh Amendment right to jury trial, governs both this court and the district court and requires that we vacate and remand.

It is bedrock that the "long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988); see also Camreta v. Greene, 131 S. Ct. 2020, 2031 (2011) (noting rule that courts must avoid resolving constitutional questions unnecessarily).  "[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."  Buchanan v. Maine, 469 F.3d 158, 172 (1st Cir. 2006) (quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981)) (internal quotation marks omitted).  No valid reason justified

---

[24]     The district court also attempted to justify its decision to bypass remittitur by making certain rulings on the merits of the constitutional issue.  For example, the district court reasoned that the "differences between the [Gore and Williams] approaches are, in practice, minimal[,]" a disputed issue.  Sony BMG Music Entm't v. Tenenbaum, 721 F. Supp. 2d 85, 101 (D. Mass. 2010).

abandonment of this doctrine in this case. The abandonment of the rule instead thrust the case into a thicket of constitutional issues it was not necessary to enter.

It was not necessary for the district court to reach the constitutional question of whether the jury's award of $22,500 per infringement was so excessive as to violate due process. If the district court had ordered remittitur, there would have been a number of possible outcomes that would have eliminated the constitutional due process issue altogether, or at the very least materially reshaped that issue.

The issue of whether the award violated due process and the Seventh Amendment issue would both have been eliminated if remittitur had been ordered and Sony had accepted the remitted award. Alternatively, if remittitur had been ordered but Sony had declined the remitted award, a new trial would have ensued. The jury could have issued an award that would not have led Tenenbaum to again seek a reduction on either common law remittitur or due process grounds.

Even if Sony had declined any remitted award given and opted for a new trial, even if a different jury issued a comparable award, and even if Tenenbaum once again moved to reduce the award on constitutional grounds, it was still premature for the court to reach the constitutional question before that process had been carried out. A new trial could have materially reshaped the nature

of the constitutional issue by altering the amount of the award at issue or even the evidence on which to evaluate whether a particular award was excessive.

In this way, reaching the constitutional question before ordering remittitur not only contravened the doctrine of constitutional avoidance, it also led the court to address questions that had not yet been fully developed. Federal courts do not answer such hypothetical questions. See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937) (Under Article III, judicial power is constrained to "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts"); see also Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 27 (1st Cir. 2006) (vacating district court's reduction of compensatory damages, remanding so that court may issue remittitur, and refusing to address constitutionality of punitive damage award because, upon remand, plaintiff might opt for a new trial and "it would be premature . . . to approve a punitive damages award based on the compensatory award from the first trial").

The path the court chose unnecessarily embroiled it in several issues of a constitutional dimension. The first was whether the due process standard for statutory damage awards articulated by the Supreme Court in Williams was applicable. The

next was whether, if there was leeway and reason to bypass the Williams standard, the Gore standard, some combination of Williams and Gore, or some other standard should be used to evaluate whether the statutory damage award violated due process.  We briefly describe the two due process standards to demonstrate the nature of the question to be avoided.

In Williams, the Supreme Court considered a challenge to an Arkansas statute that subjected railroads to penalties of "not less than fifty dollars, nor more than three hundred dollars and costs of suit," for each offense of charging passengers fares that exceeded legal limits.  See Williams, 251 U.S. at 64 (quoting Act April 4, 1887 (Laws 1887, p. 227; Kirby's Digest, 1904, § 6620); Act March 4, 1915 (Laws 1915, p. 365; Kirby & Castle's Digest, 1916, § 8094)) (internal quotation marks omitted).  After the St. Louis, I.M. & S. Railroad collected a fare from two passengers of 66 cents more than the law allowed, the passengers brought suit pursuant to the statute.  251 U.S. at 63.  Each passenger obtained a judgment of 75 dollars plus fees--an award, like the jury's award at issue here, well within the statutory range.  Id.  The railroad challenged the statutory award as unconstitutionally excessive under the Due Process Clause.  Id.

The Court acknowledged that the Due Process Clause "places a limitation upon the power of the states to prescribe penalties for violations of their laws," but noted that "States

still possess a wide latitude of discretion in the matter." Id. at 66. This is so, the court reasoned, because "the power of the State to impose fines and penalties for a violation of its statutory requirements is coeval with government; and the mode in which they shall be enforced, whether at the suit of a private party, or at the suit of the public, and what disposition shall be made of the amounts collected, are merely matters of legislative discretion." Id. (quoting Mo. Pac. Ry. Co. v. Humes, 115 U.S. 512, 523 (1885)) (internal quotation marks omitted).

Given the latitude conferred upon legislatures to impose statutory penalties, the Court rejected the railroad's due process argument. The Court articulated that a statutory damage award violates due process only "where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." Id. at 66-67.

Gore and its progeny address the related but distinct issue of when a jury's punitive damage award is so excessive as to violate due process. See Gore, 517 U.S. at 574. The Court, animated by the principle that due process requires that civil defendants receive fair notice of the severity of the penalties their conduct might subject them to, id., identified three factors to guide a court's consideration of whether a punitive damage award is so excessive as to deprive a defendant of due process: (1) the degree of reprehensibility of the defendant's conduct, id. at 575-

80, (2) the ratio of the punitive award to the actual or potential harm suffered by the plaintiff, id. at 580-83, and (3) the disparity between the punitive award issued by the jury and the civil or criminal penalties authorized in comparable cases, id. at 583-85.

In Copyright Act award cases, there are many questions regarding the relationship between Gore's guideposts for reviewing punitive damage awards and the Williams standard for reviewing statutory damage awards. One is the relationship between the purposes of statutory damages under the Copyright Act as opposed to the purpose of punitive damages. Another concerns the limits or contours of possible ranges of awards under the different standards. Further, both Williams and Gore concerned limitations on state-authorized awards of damages, and did not concern Congressionally set awards of damages, which Congress is authorized to do under its Article I powers. This fact in turn raises concerns about intrusion into Congress's power under Article 1, Section 8 of the Constitution.

We note that in Gore, the Supreme Court did not overrule Williams. See Rivers v. Roadway Express, Inc., 511 U.S. 298, 312 (1994) (hierarchical relationship of Supreme Court to lower courts mandates that where "the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law"). Nor has the Supreme Court to date suggested that the Gore

guideposts should extend to constitutional review of statutory damage awards. The concerns regarding fair notice to the parties of the range of possible punitive damage awards present in Gore are simply not present in a statutory damages case where the statute itself provides notice of the scope of the potential award. And the only circuit court of which we are aware to directly address the issue declined to apply Gore in this context and instead applied the Williams test. See Zomba Enters., Inc. v. Panorama Records, Inc., 491 F.3d 574, 587 (6th Cir. 2007). Cf. Parker v. Time Warner Entm't Co., 331 F.3d 13, 22 (2d Cir. 2003) (suggesting, in dicta, that Gore might govern due process review of statutory damage awards).

Had the district court ordered remittitur and not reached the constitutional question, it would not have needed to consider these issues or determine the relevant standard for assessing the constitutionality of a Copyright Act statutory damage award.

A decision based on remittitur, under which a new trial must be granted if plaintiffs do not accept the remitted award, also would have avoided another complicated constitutional question, which we describe briefly.

That issue arises under the Seventh Amendment, and is whether a statutory damage award under the Copyright Act may be

reduced without offering the plaintiffs a new trial.[25]  Neither this court nor the Supreme Court has directly addressed the issue, but the Court's <u>Feltner</u> decision must be taken into account.

The usual rule for a general damage award is that a court may not reduce a jury's verdict and effectively impose a remittitur without affording a plaintiff "the option of a new trial when it enter[s] judgment for the reduced damages."  <u>Hetzel</u> v. <u>Prince William Cnty.</u>, 523 U.S. 208, 211 (1998); <u>see</u> <u>also</u> <u>Dimick</u> v. <u>Schiedt</u>, 293 U.S. 474, 486-87 (1935) (affirming remittitur power of courts but noting that where a verdict is set aside, the parties retain their right to have a jury determine the measure of damages); <u>Kennon</u> v. <u>Gilmer</u>, 131 U.S. 22, 29 (1889) (finding that under the Seventh Amendment a court has no authority to reexamine facts determined by a jury, or to enter "according to its own estimate of the amount of damages which the plaintiff ought to have recovered . . . an absolute judgment for any other sum than that assessed by the jury").  Citing <u>Hetzel</u>, we have held a trial court's reduction in compensatory damages must, to avoid Seventh Amendment error, allow the plaintiff a new trial.  <u>Bisbal-Ramos</u>, 467 F.3d at 26 (reversing and remanding for consideration of

---

[25]     The Seventh Amendment provides that, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.

remittitur where trial court had reduced compensatory damages without offering plaintiffs new trial).

By contrast, there is law indicating that a punitive damage award may be reduced on due process grounds (without offering plaintiffs a new trial) without running afoul of the Seventh Amendment. The Supreme Court's punitive damages jurisprudence suggests as much, but the question has not been directly addressed by the Court. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) (finding punitive damage award violated due process); Gore, 517 U.S. 559 (same). Some circuits, including our own, have found that "a court may reduce an excessive award of punitive damages without giving the plaintiff the option of a new trial." Bisbal-Ramos, 467 F.3d at 27 (collecting cases); see also Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 52 (1st Cir. 2009) ("If we find an award 'grossly excessive,' we may ascertain the amount of punitive award that is appropriate and order the district court to enter judgment in such amount."). But neither Bisbal-Ramos nor Mendez-Matos decided the question as to a statutory damages award.[26]

In bypassing remittitur and reducing the jury's award without offering Sony a new trial, the district court assumed that

---

[26] Additionally, some courts have suggested that even under Gore, a court must give plaintiff the option of a new trial when it reduces a punitive damages award on due process grounds. See S. Union Co. v. Irvin, 563 F.3d 788, 790 (9th Cir. 2009); Lee v. Edwards, 101 F.3d 805, 813 (2d Cir. 1996).

statutory damage awards should be treated largely as punitive, not compensatory, awards for Seventh Amendment purposes. But statutory damages, unlike punitive damages, have both a compensatory and punitive element. See 17 U.S.C. § 504(c); Feltner, 523 U.S. at 352 ("[A]n award of statutory damages [under § 504(c)] may serve purposes traditionally associated with legal relief, such as compensation and punishment."); F.W. Woolworth Co., 344 U.S. at 233 ("The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.").

Further, the Supreme Court's analysis of a different Seventh Amendment issue in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 437 (2001) suggests that punitive damage awards do not implicate the Seventh Amendment for reasons that do not apply to statutory damage awards. In Cooper, the Court observed that the Seventh Amendment provides only that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law," U.S. Const. amend. VII (emphasis added), and reasoned that "the level of punitive damages is not really a 'fact' 'tried' by the jury," Cooper Indus., 532 U.S. at 437 (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 459 (1996) (Scalia, J., dissenting)) (internal quotation mark omitted). But statutory damage awards are different. In Feltner, the Supreme Court

-62-

determined that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself." Feltner, 523 U.S. at 355.

The point here is not for us to decide these issues, but merely to describe them to show the importance of adherence to the doctrine of constitutional avoidance. The courts of appeals are likewise bound by that doctrine, and we are required to apply it here.[27]

---

[27] Sony rather weakly asserts remittitur is not available where, as here, an award falls within a prescribed statutory range. We do not take as given the questionable proposition that in enacting the Copyright Act, Congress intended to eliminate the common law power of the courts to consider remittitur. Common law remittitur has roots deep in English and American jurisprudence. See Honda Motor Co. v. Oberg, 512 U.S. 415, 424-26 (1994); Dimick v. Schiedt, 293 U.S. 474, 482-83 (1985) (citing Blunt v. Little, Fed. Cas. No. 1,578, 3 Mason 102 (1822) (Story, J.)). We see no reason to think Congress meant to override this aspect of the common law.

In the post-Feltner amendment of the Copyright Act, Congress said nothing evidencing an intent to eliminate remittitur. See Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-1060, 113 Stat. 1774. Congress is presumed to legislate incorporating background principles of common law unless it indicates to the contrary. See Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 131 S. Ct. 2188, 2196 (2011) (rejecting statutory interpretation that conflicts with "two centuries of patent law"); Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 109 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles."). Further, the principle of remittitur is embodied in Federal Rule of Civil Procedure 59. Thus, the district court's decision not to consider remittitur as requested appears to be contrary to Congressional intent.

V.

Conclusion

This was a difficult and contentious case and the parties received a fair trial from an admirably patient and able district judge.

We affirm the finding of liability against Tenenbaum and in favor of plaintiffs. We affirm the injunctive relief. We have, inter alia, rejected Tenenbaum's arguments that the Copyright Act is unconstitutional under Feltner, 523 U.S. 340, that the Act exempts so-called "consumer copying" infringement from liability and damages, that statutory damages under the Act are unavailable without a showing of actual harm, that the jury's instructions were in error, and his various trial error claims.

We vacate the district court's due process damages ruling and reverse the reduction of the jury's statutory damages award. We reinstate the jury's award of damages and remand for consideration of plaintiff's motion for common law remittitur based on excessiveness.[28]

If, on remand, the court allows any reduction through remittitur, then plaintiffs must be given the choice of a new trial or acceptance of remittitur.

---

[28] If the district court determines that the jury's award does not merit common law remittitur, the court and the parties will have to address the relationship between the remittitur standard and the due process standard for statutory damage awards, should the issue continue to be raised.

So ordered.

Costs are awarded to plaintiffs.