# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2020

Lyle W. Cayce
Clerk

No. 18-20350

_____

ENERGY INTELLIGENCE GROUP, INCORPORATED; ENERGY INTELLIGENCE GROUP (UK) LIMITED,

Plaintiffs - Appellants Cross-Appellees

v.

KAYNE ANDERSON CAPITAL ADVISORS, L.P.; K.A. FUND ADVISORS, L.L.C.,

Defendants - Appellees Cross-Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

cons w/18-20615

ENERGY INTELLIGENCE GROUP, INCORPORATED; ENERGY INTELLIGENCE GROUP (UK) LIMITED,

Plaintiffs - Appellants

v.

KAYNE ANDERSON CAPITAL ADVISORS, L.P.; K.A. FUND ADVISORS, L.L.C.,

Defendants - Appellees

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

No. 18-20350

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited ("EIG") collectively publish information and news relevant to the global energy industry. One of EIG's publications is *Oil Daily*, a daily newsletter that provides news and analysis about the North American petroleum industry.

Defendants Kayne Anderson Capital Advisors, LP and Kayne Anderson Fund Advisors, LLC ("KA") collectively are a boutique investment firm. Energy securities make up a substantial part of KA's business. In 2004, KA began purchasing an annual *Oil Daily* subscription for KA partner James Baker. Between 2004 and 2014, Baker routinely shared his *Oil Daily* access with fellow KA employees and other third parties in violation of his subscription agreements and copyright law. KA attempted to keep EIG from discovering these activities, including by saving and sending *Oil Daily* as a file named "123."

In July 2014, EIG filed suit alleging numerous instances of copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA"). As relevant to this appeal, KA's defense rested on two theories: (1) EIG learned of KA's infringement in 2007 but did nothing to investigate or dissuade KA; and (2) EIG knew that many of its subscribers improperly distributed its newsletters but consciously declined to crack down on such sharing because litigating copyright claims against large clients was more profitable. The district court rejected KA's equitable estoppel and unclean hands defenses at summary judgment but allowed KA to proceed with a mitigation defense. The district court held that "a reasonable fact-finder could infer . . . that the subsequent alleged infringement could have been avoided."

In March 2017, EIG confirmed to KA that it would seek statutory

2

No. 18-20350

damages on all claims. EIG then filed a pretrial memorandum arguing that KA could not invoke mitigation as a complete defense—in other words, regardless of whether EIG could reasonably have avoided or prevented KA's acts, EIG should receive damages within the mandated ranges for each infringed work and each DMCA violation.[1] On December 6, 2017, during trial, the district court orally overruled EIG's argument. In May 2017, KA moved for referral to the Copyright Office, alleging that EIG's copyright registrations were based on inaccurate applications. In July 2017, the district court denied KA's referral motion after finding no inaccuracies in EIG's applications.

At trial in December 2017, KA persuaded the jury that EIG could reasonably have avoided almost all the copyright and DMCA violations at issue. EIG took nothing for those violations and received $15,000 in statutory damages for 39 infringed works, which amounted to approximately half a million dollars. Based on the Copyright Act's and DMCA's fee-shifting provisions, as well as KA's Rule 68 motion, the district court awarded EIG $2.6 million in attorney's fees and $21,000 in costs.[2] Both parties timely filed notices of appeal and their appeals were consolidated.

The issue presented in EIG's appeal is one of first impression: whether failure to mitigate is a complete defense to liability for statutory damages under the Copyright Act and the DMCA. The parties agree that EIG's failure to mitigate is a relevant factor in deciding what statutory damages ought to be imposed, but they disagree over whether failure to mitigate can preclude

---

[1] *See* 17 U.S.C. § 504(c) (infringement damages "in a sum of not less than $750 or more than $30,000 as the court considers just"); 17 U.S.C. § 1203(c)(3)(B) (DMCA damages "in the sum of not less than $2,500 or more than $25,000").

[2] Prior to trial, KA offered to settle the lawsuit for $5 million. EIG rejected this offer. Because EIG was ultimately the prevailing party, the district court calculated costs and attorney's fees by awarding EIG pre-offer costs and attorney's fees. The district court then subtracted KA's post-offer costs from EIG's award.

3

liability altogether. EIG says it cannot and urges the court to instate an award of $25,752,500 ($15,000 for each of 1,646 works infringed plus $2,500 for each of 425 DMCA violations) in EIG's favor. KA counters that mitigation is a complete defense to liability and that the district court's award of $585,000 in statutory damages was appropriate.

Two other issues are raised in KA's appeal. First, KA contends that the district court erred in denying its § 411 motion for referral to the Copyright Register. Second, KA argues that it should have received post-offer attorney's fees under Rule 68.

We hold that failure to mitigate is not a complete defense to copyright or DMCA claims for statutory damages; the district court properly denied KA's referral motion; and the district court properly denied KA's post-offer attorney's fees under Rule 68. Remand is necessary to determine copyright damages because we cannot determine whether the jury intended to award EIG $15,000 per infringed work. Remand is also necessary to re-calculate appropriate awards, attorney's fees, and costs. If total damages ultimately amount to more than $5 million (KA's Rule 68 offer), KA may no longer be eligible to recover post-offer costs.

We AFFIRM the district court's denial of KA's § 411(b) referral motion. We VACATE the judgment in full and instate an award of $1,062,500 for EIG's DMCA claims. We REMAND as to copyright damages, attorney's fees, and costs, with the clarification that non-prevailing copyright and DMCA defendants may not recover post-offer attorney's fees under Rule 68.

## I.

### A. Pre-Suit Factual Background

Baker started working for KA in 2004 and began subscribing to *Oil Daily* shortly thereafter. At the time, approximately four other professionals worked in Baker's office. Baker initially accessed *Oil Daily* by logging in to EIG's

website with a username and password, which he shared with his co-workers so that they could also access the publication.

*Oil Daily* was always marked with copyright notices and warnings compliant with the notice requirements of 17 U.S.C. § 401. Each newsletter contained a copyright notice on the front cover and masthead.

In January 2007, KA employee Ron Logan had trouble accessing Baker's EIG account. On January 3, 2007, Baker's assistant Diana Lerma emailed EIG representative Deborah Brown for assistance, forwarding a KA internal email stating, "Ron . . . was not able to access your [Baker's] oil daily." Brown noticed the reference to "Ron" accessing Baker's account. She testified in her deposition that this "would send up a red flag that more than the authorized user was accessing it" and recalled that she "probably escalated the issue" to her supervisors at EIG.

Just a few hours later that day, EIG employee Peter Buttrick called Lerma to discuss KA's subscription. After the call, Buttrick indicated by email to Mark Hoff, EIG's Vice President of Sales, that he had just spoken with Lerma "[o]n the copyright issue – I discussed the severity of the issue and advised her to schedule a call with her boss, Jim Baker[,] . . . and I as soon as possible to discuss options." On KA's side, Lerma emailed Baker:

> One hiccup: they want to know how many users we have. They said that we need to confirm that you'd be the only [*sic*] accessing the information; otherwise we would be "sharing" and that is against their policy. Each additional user is $1554 annually. They have recently found multiple users on one account and then gone back to charge that company for the excess. So they want to give us a heads up to avoid this happening to us. What do you propose? Say 3 users so that you can continue your access and then add myself and Ron? Or just you and I and just tell the others not to go online to avoid tracking anything back to us via the email addresses.

Baker instructed Lerma to "[h]ave them [EIG] email the document to me on a daily basis. No web-based access. Please forward the document to the rest

of the group." Thereafter, Baker began receiving *Oil Daily* as an emailed PDF, which his assistants regularly forwarded to other KA employees.

KA upgraded its subscription in 2013 to allow five authorized users and continued subscribing to *Oil Daily* through 2014. However, the number of KA employees accessing *Oil Daily* far exceeded five. By 2014, 20 people in the office regularly received the newsletter.

Besides sharing *Oil Daily* internally within KA, Baker's assistants also sometimes forwarded *Oil Daily* to third party non-subscribers. For example, KA employee Jennifer Rodgers regularly emailed copies of *Oil Daily* to a company called Crestwood Midstream Partners. In doing so, she named each file "123," seemingly at both Lerma's instruction and Crestwood's request to avoid detection by EIG.[3] By contrast, when EIG emails *Oil Daily* as a PDF to its subscribers, the PDF is named in the format "DE" followed by the date in YYMMDD format. At trial, EIG identified 425 instances where KA had sent *Oil Daily* files named "123" to other entities.

On February 5, 2014, in response to a request for information by EIG, KA employee Ana Pope ingenuously informed EIG Account Manager Derrick Dent,

> The Oil Daily is sent to one person in the office, Jim Baker. He usually gets it the night before it is published for and forwards it to me that night. When I get into the office that next morning the first thing I do, around 7:40am, is email it out to the 20 or so people in the office who have elected to receive the oil daily every morning.

EIG did not immediately reply. On February 21, 2014, Pope emailed

---

[3] Lerma was questioned about her instruction to "save [*Oil Daily*] as PDF 123 and e-mail it to . . . Crestwood" and Crestwood emailed KA saying "just for future reference, name this doc 123 so that it hopefully can't be traced". Rodgers agreed that "123 was a code to refer to *Oil Daily*," and that she did not use the "123" naming convention when circulating *Oil Daily* within KA. Rodgers also testified that she would download, print, scan, and re-name the *Oil Daily* document.

No. 18-20350

Dent again, requesting, "Would you mind sending the oil daily that usually goes to James Baker directly to me today? James is out of town on the Pacific coast and probably won't wake up for another few hours." Dent then responded,

> According to Kayne Anderson's site license agreement, only five employees are granted access to *Oil Daily* as Authorized Users. The agreement states that it is not permissible to forward our publications to anyone who is not an Authorized user. This kind of activity is in violation of our license agreements and of our copyrights.

KA continued its normal practice of sharing *Oil Daily* until May 2014, when EIG formally sent KA's general counsel a letter complaining of infringement.

### B. Relevant Pre-Trial Motions

EIG filed suit against KA for copyright infringement on July 8, 2014. After filing suit and obtaining discovery, EIG learned of KA's practice of sending *Oil Daily* as a file named "123" to third parties. EIG amended its complaint in October 2015 to add allegations that KA had altered *Oil Daily*'s "copyright management information" ("CMI") in violation of the DMCA, 17 U.S.C. § 1202(b).

KA's answer to the operative complaint asserted various affirmative defenses, including that EIG's claims were barred in whole or in part by its failure to mitigate damages, equitable estoppel, and unclean hands or entrapment. In January 2017, the district court granted EIG summary judgment on KA's defenses of equitable estoppel and unclean hands/entrapment, but denied EIG summary judgment on KA's mitigation defense. KA does not directly appeal the dismissal of its other defenses.[4]

---

[4] However, KA argues that if the court finds mitigation is not a complete defense to EIG's claims, KA should have an opportunity to present the same arguments about EIG's conduct through a defense of unclean hands. KA cites no relevant authority to support its assertion that a reasonable jury could find unclean hands on EIG's part. KA relies on two

No. 18-20350

Under each defensive theory, KA argued that EIG pursued a litigious business strategy of waiting for infringements to pile up and then seeking outsized statutory damages. The district court concluded that such conduct could support an affirmative defense of mitigation, but not of equitable estoppel or unclean hands.

In March 2017, EIG confirmed to KA that it would seek statutory damages on all claims. In April 2017, EIG filed a pretrial memorandum arguing that KA could not rely on mitigation as a complete defense. As jury instructions were being finalized, EIG conceded that mitigation could be a "limiting factor" in assessing statutory damages, but continued to argue that mitigation should not be submitted as an "absolute defense" to liability for statutory damages. The district court orally overruled EIG's objection and decided that the verdict form would include questions about whether EIG had failed to mitigate its damages, and if so, how many acts of infringement EIG could have avoided.

Registration of a copyright is a prerequisite to obtaining statutory

---

*Design Basics* cases, but neither is on point. In *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1097 (7th Cir. 2017), the Seventh Circuit criticized those who "bring[] strategic infringement claims of dubious merit in the hope of arranging prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation." *Id.* But the decision itself is not about the unclean hands defense at all; rather, the circuit court affirmed the grant of summary judgment to the defendant based on the plaintiff's failure to prove infringement. In *Design Basics, LLC v. Petros Homes, Inc.*, 240 F. Supp. 3d 712, 721 (N.D. Ohio 2017), the district court found a basis for a misuse of copyright defense, based primarily on defendants' contention that plaintiffs were asserting copyright "protection over things not able to be copyrighted." *Id.* at 720. KA, however, never asserted any such theory of unclean hands to the district court. In *Petros Homes*, the district court did note defendants' complaint that plaintiffs used a litigious business model, but only in connection with defendants' core allegation that plaintiffs were misrepresenting the scope of their rights.

Courts have recognized unclean hands when a party makes serious misrepresentations—for instance, by "falsifying a court order, by falsifying evidence, or by misrepresenting the scope of his copyright to the court and opposing party," or by perpetuating a "fraud on the Copyright Office." 4 Nimmer on Copyright § 13.09[B] (2019) [hereinafter Nimmer]. KA has not pointed to such evidence on EIG's part.

damages for infringement. 17 U.S.C. §§ 411(a), 412. EIG's original and amended complaints attached the copyright registrations for the *Oil Daily* works at issue. In April 2017, after being notified by email of EIG's intent to seek statutory damages, KA stipulated to the validity of EIG's copyright registrations in the parties' joint pretrial order. However, in May 2017—nearly three years after EIG filed suit, one week before the final pretrial hearing scheduled for May 11, 2017, and six weeks prior to the June 19, 2017 trial date—KA moved for a referral to the Copyright Office and a stay of district court proceedings, arguing under § 411(b) that EIG's copyright registrations were invalid. The district court postponed trial to consider the motion. Relying on *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013), the district court found no referral was needed because KA failed to establish that EIG knowingly included inaccurate information in its registration materials.

### *C. Jury Trial*

The district court presided over a four-day jury trial from December 4 to 7, 2017. In its opening statement, EIG argued that KA had a "systematic" practice of sharing *Oil Daily* internally and with other companies, and had wrongfully shared at least 1,646 separate issues. KA's opening conceded that KA had improperly shared *Oil Daily* and concealed its sharing from EIG. But, over the course of trial, KA argued that EIG had a "wait, don't warn" business model. KA argued that EIG knew in January 2007 that Baker was sharing his EIG credentials, yet sat on its hands by conducting no investigation and by failing to warn Baker of the Copyright Act's hefty statutory damages provision. KA admitted evidence that made it difficult for EIG witnesses to dispute that copyright litigation is an important component of EIG's overall business strategy. For example, KA elicited an admission from EIG's Director for Sales and Marketing that he had written in 2014, "My number one priority [is]

contributing to litigation efforts."

At the close of trial, the district court instructed the jury to set statutory damages in light of factors including (1) benefits obtained by KA from infringement, (2) EIG's lost revenues, (3) the difficulty of proving EIG's actual damages, (4) the circumstances of KA's infringement, (5) deterrence, and (6) the actions taken by EIG to mitigate their damages. Separately, the district court instructed the jury that EIG had a duty "to use reasonable diligence to mitigate its damages, that is, to avoid or minimize those damages," and could "not recover for any item of damage that they could have avoided through reasonable effort."

The jury was presented with a special verdict form consisting of fifteen questions. The key takeaways from the jury verdict are:

(1) KA infringed 1,646 individual *Oil Daily* works between December 29, 2004 and July 8, 2014 and should pay $15,000 in statutory damages for each work infringed.

(2) EIG knew or should have known of KA's infringement before July 8, 2011. However, KA fraudulently concealed its copying of *Oil Daily* and EIG failed to discover the copying despite exercising due diligence.

(3) EIG failed to mitigate its copyright damages and could have avoided 1,607 acts of infringement through reasonable diligence.

(4) KA intentionally altered copyright management information for *Oil Daily* 425 times, while having reasonable grounds to know that this would induce, enable, facilitate, or conceal copyright infringement. The amount of $2,500 in statutory damages for each DMCA violation was appropriate.

(5) EIG failed to mitigate its DMCA damages and could have avoided all 425 violations if it had exercised reasonable diligence.

### D. Post-Trial Motions

After trial, EIG filed a Rule 59 motion renewing its argument that

mitigation could not serve as an absolute defense to liability for statutory damages under the Copyright Act or DMCA. The district court denied the motion.

The district court noted a lack of binding precedent and a lower court "split on whether failure to mitigate damages is available as a defense when, as here, plaintiff seeks only statutory damages." After reviewing this lower court authority, the district court stated its agreement with cases like *Malibu Media, LLC v. Guastaferro*, No. 1:14-CV-1544, 2015 WL 4603065, at *5 (E.D. Va. July 28, 2015). The district court appeared to adopt that court's reasoning that although mitigation is "typically only applied to claims for actual damages, the defense may be relevant to claim[s] requesting statutory damages because one purpose of statutory damages is to approximate actual damages that are difficult to prove." *Id.* (internal quotation marks omitted). The district court therefore awarded EIG $585,000 for the 39 infringed works that EIG could not have reasonably avoided. The district court awarded EIG nothing for 1,607 infringed works and nothing for all 425 DMCA violations.

Both parties claimed to be the prevailing party and sought attorney's fees and costs under the fee-shifting provisions of the Copyright Act and DMCA. KA sought $4.4 million in attorney's fees and $60,000 in costs; EIG sought $6.5 million in attorney's fees and $640,000 in costs. The district court concluded that EIG was the prevailing party because EIG's $585,000 award would "modify Kayne's behavior for EIG's benefit forcing Kayne to pay an amount of money that Kayne otherwise would not pay." The district court initially awarded EIG $4.2 million in attorney's fees and $75,000 in costs.

Because KA had extended a Rule 68 offer of settlement for $5 million, KA then moved to modify EIG's award of attorney's fees and costs. Under Rule 68(d), because "the judgment that the offeree [EIG] finally obtain[ed was] not more favorable than the unaccepted offer, the offeree [EIG] must pay the costs

incurred after the offer was made." Fed. R. Civ. P. 68(d). All parties agreed that EIG was responsible for its own post-offer costs and attorney's fees and that EIG had to cover KA's post-offer costs. EIG argued, however, that under Rule 68, EIG did not have to pay for KA's post-offer attorney's fees. The district court agreed with EIG and ultimately awarded EIG $2.6 million in attorney's fees and $21,000 in costs.

## II.

We conclude that statutory damages under § 504(c) may not be remitted based on a plaintiff's unreasonable failure to prevent copyright infringement. For similar reasons, statutory damages under § 1203 may not be remitted based on a plaintiff's unreasonable failure to prevent alteration of CMI. The district court properly denied KA's motion for referral to the Copyright Office. The district court properly refused to award post-offer attorney's fees to KA under Rule 68. The following sections explain the bases for our holdings.

### A. Mitigation of Copyright Damages

EIG contends that the district court erred by declining to award any damages for the 1,607 works that EIG could reasonably have protected from infringement. Because this ruling relied on legal conclusions, we review the district court's decision to preclude recovery for those works de novo. *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 438 (5th Cir. 2017). As all parties agree, this issue is a matter of first impression unaddressed by any appellate court.

#### i. *Petrella v. Metro-Goldwyn-Mayer, Inc.*

"Congress is understood to legislate against a background of common-law adjudicatory principles. Thus, where a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*,

No. 18-20350

501 U.S. 104, 108 (1991) (internal quotation marks and citations omitted). The viability of KA's mitigation defense therefore turns on (1) the nature of the common-law principle of mitigation, and (2) whether the Copyright Act contains a statutory purpose to the contrary.

These two factors—statutory purpose and the nature of the common-law defense asserted—were central to *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 668 (2014), which held that Congress precluded the equitable defense of laches in copyright cases by providing a three-year statute of limitations. In *Petrella*, the accused work was MGM's 1980 film *Raging Bull*. *Id.* at 673. Plaintiff Petrella contended that *Raging Bull* was derivative of a 1963 screenplay written by her father. *Id.* Petrella had acquired the rights to the screenplay in 1991. *Id.* Yet she waited until 1998 to contact MGM and did not file suit until January 2009. *Id.* at 674. When Petrella did file suit, she sought damages only for infringement beginning three years prior in January 2006. *Id.* at 675–76. The trial court granted summary judgment for MGM on its laches defense, finding both unreasonable delay and prejudice, and the Ninth Circuit had affirmed. *Id.* at 675. Both courts below took note of MGM's "significant investments" in exploiting the film (e.g., marketing, converting to modern DVD and Blu-Ray formats), as well as Petrella's candid admission that she delayed suit because the film hadn't made much money in earlier years. *Id.* at 676–77.

The Supreme Court reversed. *Id.* at 688. On statutory purpose, the Court found that "the copyright statute of limitations, § 507(b), itself takes account of delay." *Id.* at 677. The statute of limitations, in combination with the "widely recognized" rule of separate accrual for copyright claims,[5] meant that Petrella

---

[5] The rule of separate accrual, as discussed in *Petrella*, takes as given that a copyright claim accrues when an infringing act occurs (the "incident of injury" rule) and treats each

was foreclosed from seeking damages for any acts completed before January 2006. *Id.* at 671, 675. Because the Copyright Act already "secured to authors a copyright term of long duration, and a right to sue for infringement occurring no more than three years back from the time of suit," the Court perceived "'little place' for a doctrine that would further limit the timeliness of a copyright owner's suit." *Id.* at 685 (citing 1 D. Dobbs, Law of Remedies § 2.6(1), p. 152 (2d ed. 1993)).

The Court's reading of the Copyright Act was informed by its concern that "[i]nviting individual judges to set a time limit other than the one Congress prescribed . . . would tug against the uniformity Congress sought to achieve when it enacted § 507(b)." *Id.* at 680–81. The Court also noted that a plaintiff's delay can be accounted for at the remedial phase, because an infringing defendant may "retain the return on investment shown to be attributable to its own enterprise, as distinct from the value created by the infringed work." *Id.* at 677–78.

Thus, on the nature of the common law defense, the Court declared that laches is "gap-filling, not legislation overriding." *Id.* at 680. Historically, "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Id.* at 687 (citing Dobbs at § 2.4(4), p. 104).[6]

---

successive infringing act as a new, independent wrong with its own limitations period. 572 U.S. at 670–71.

[6] The Court distinguished laches from the common-law doctrines of equitable tolling and estoppel, which do apply to copyright suits. Recognizing that "equitable tolling is read into every federal statute of limitation," the Court explained that whereas tolling is a "rule of interpretation tied to" a statute of limitations, laches "originally served as a guide when no statute of limitations controlled the claim; it can scarcely be described as a rule for interpreting a statutory prescription." *Id.* at 681–82 (internal quotation marks omitted). As for estoppel, "[t]he test for estoppel is more exacting than the test for laches," and "[t]he gravamen of estoppel . . . is misleading and consequent loss." *Id.* at 684. Estoppel, the Court recognized, could serve as a complete defense "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged

No. 18-20350

Two additional features of the *Petrella* decision are relevant to this appeal. First, the Court indicated that Petrella should not be faulted for "sitting still, doing nothing, waiting to see what the outcome of an alleged infringer's investment will be." *Id.* at 682 (discussing MGM's contention that "Petrella *conceded* that she waited to file because 'the film was deeply in debt and in the red and would probably never recoup'"). Second, the Court recognized that prejudicial delay could, in "extraordinary circumstances," result in "curtailment of the relief *equitably awardable*" "at the very outset of the litigation." *Id.* at 685 (emphasis added).[7]

With *Petrella* in mind, we consider the Copyright Act's statutory purpose and the nature of the mitigation defense.

### ii. *Statutory damages under the Copyright Act*

As described below, the modern Copyright Act's statutory damages regime has a significant deterrent and potentially punitive purpose. Compensation is a relevant purpose but not the sole purpose. In its current form, the Copyright Act allows a copyright owner to recover either "actual damages and any additional profits of the infringer," or "statutory damages," but not both. 17 U.S.C. § 504(a). A copyright owner may choose statutory damages "regardless of the adequacy of the evidence offered as to his actual damages and the amount of defendant's profits, and even if he has

---

infringer detrimentally relies on the copyright owner's deception." *Id.* at 684. Delay is not an element of an estoppel defense, whereas for laches, "timeliness is the essential element." *Id.* at 684–85. And a plaintiff's timeliness is already accounted for by the three-year statute of limitations.

[7] For example, in a case where plaintiffs alleged infringement of their architectural designs after defendant-developers had already built 168 units (109 of which were occupied), the plaintiffs properly were denied "an order mandating destruction of the housing project." *Id.* at 686. Although Petrella's lawsuit did not present such extraordinary circumstances, the Court noted that her conduct "may or may not (we need not decide) warrant limiting relief at the *remedial stage*, but they are not sufficiently extraordinary to justify threshold dismissal." *Id.* at 687 (emphasis added).

15

intentionally declined to offer this evidence, although it was available." 4 Nimmer § 14.04[A]; *see, e.g.*, *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 507 (1st Cir. 2011) ("[T]he availability of statutory damages is not contingent on the demonstration of actual damages."); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496–97 (4th Cir. 1996) (upholding maximal copyright statutory damages award of $400,000 where gross revenue from infringement was $10,200).

The modern statutory damages regime set forth in § 504(c) arose with the Copyright Act of 1976.[8] *See* 4 Nimmer § 14.01[B]. Before the 1976 Act created Section 504(c), statutory damages for copyright were described in Section 101(b) of the 1909 Act. *Id.* Statutory damages could be awarded "in lieu of actual damages and profits" and "shall not be regarded as a penalty." 17 U.S.C. § 101(b) (1909). "The 1909 Act itself was silent as to whether and when such 'in lieu' statutory damages were mandatory and/or permissive." 4 Nimmer at § 14.04[F][1].

The Supreme Court regarded statutory damages as appropriate only where it was not possible to reliably measure "actual damages and profits." *See Douglas v. Cunningham*, 294 U.S. 207, 209 (1935) (statutory damages were adopted "to give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits"); *F. W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 232–33 (1952) (holding that whether trial court's "discretionary resort to estimation of statutory damages is just should be determined by taking into account . . . the difficulties in the way of proof of either" actual

---

[8] The Copyright Act of 1976 originally provided for a default statutory damage range of $250 to $10,000. 17 U.S.C. § 504(c) (1976). Since 1976, the statutory damage range has been updated several times. *See, e.g.*, Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106–160, 113 Stat. 1774 (1999).

damages or lost profits and that "[l]ack of adequate proof on either element would warrant resort to the statute in the discretion of the court."). However, under the 1909 Act, *if* statutory damages were appropriately granted, the trial court's discretion in setting damages was extremely broad. The Act's statutory damages regime did "not merely compel[] restitution of profit and reparation for injury but also [was] designed to discourage wrongful conduct. . . . Even for *uninjurious* and *unprofitable* invasions of copyright the court [could], if it deem[ed] it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." *Woolworth*, 344 U.S. at 233 (emphasis added).

As noted, the 1976 Act revised the 1909 Act by establishing an unequivocal right on the part of copyright owners to opt for statutory damages at any time before final judgment. The 1976 Act also eliminated § 101(b)'s no-penalty provision.[9] In light of these revisions, modern statutory damages are even more clearly "designed to discourage wrongful conduct" and may be imposed to "sanction and vindicate" the statutory policy against copyright infringement. *Cf. Woolworth*, 344 U.S. at 233. Modern appellate decisions continue to emphasize this deterrence purpose, particularly where the defendant's infringement was willful, as KA's was here. *See, e.g.*, *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1271 (11th Cir. 2015) ("The Copyright Act's statutory damages provision is designed to discourage wrongful conduct."); *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) (discussing "punitive and deterrent purposes" of statutory damages for willful infringement and noting that "statutory damages may serve completely different purposes than actual damages"); *Chi-Boy Music v.*

---

[9] For further discussion and scholarly criticism of the statutory damages provisions of the 1976 Act, see Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 WM. & MARY L. REV. 439, 451–63 (2009), and Roger D. Blair & Thomas F. Cotter, *An Economic Analysis of Damages Rules in Intellectual Property Law*, 39 WM. & MARY L. REV. 1585, 1653–72 (1998).

No. 18-20350

*Charlie Club, Inc.*, 930 F.2d 1224, 1229–30 (7th Cir. 1991) (holding that the district court calculation of statutory damages could consider "efficacy of the damages as a deterrent to future copyright infringement," and where infringement is willful, "the statutory damages award may be designed to penalize the infringer and to deter future violations" (internal quotations omitted)). Thus, under *Woolworth*, and in light of the revisions made by the 1976 Act, statutory damages are intended not only to compensate copyright owners but also to deter copyright infringers.[10] We additionally note that the Copyright Act itself embeds statutory protections against manipulation. Thus, Section 401 requires that a plaintiff give notice and, correspondingly, Section 507(b) applies a strict limitations period. 17 U.S.C. §§ 401, 507.

### iii. *Mitigation and post-injury consequential damages*

Mitigation applies to post-injury consequential damages. The doctrine of mitigation provides little support for KA's contention that EIG could not recover statutory damages for infringement that EIG failed to reasonably prevent. As explained below, the "duty to mitigate" refers to methods of apportioning damages in light of a plaintiff's reasonable efforts to reduce loss *after* an injury occurs, not before. Further, authorities indicate that mitigation rules apply to consequential damages.[11] Actual damages and defendant's profits under the Copyright Act are a form of consequential damages, but EIG did not seek such damages. Statutory damages under the Copyright Act, as discussed above, are not solely intended to approximate actual damages. They serve purposes that include deterrence. Statutory damages under the

---

[10] *See, e.g.*, 4 Nimmer § 14.04[A] (noting that since 1976, Congress has repeatedly increased the statutory damages range to account for both inflation and deterrence).

[11] Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages-Equity-Restitution (3d ed. 2018) [hereinafter Dobbs]. An older edition of the same treatise was cited and relied upon by the Supreme Court in *Petrella*.

18

No. 18-20350

Copyright Act are therefore distinct from the type of damages that are typically calculated according to rules of mitigation.

The duty to mitigate arises after an injury occurs, not before. In *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 932 (5th Cir. 1979), we explained that mitigation is a method of apportioning damages where the party, "subsequent to infliction of the harm," fails to reasonably avoid loss. Other circuits agree that the "duty" arises only after injury.[12] *Cf. Nilson-Newey & Co. v. Ballou*, 839 F.2d 1171, 1175 (6th Cir. 1988) ("[T]he duty to mitigate arises only after the defendant's tortious conduct, not before it.").

KA appears to recognize that the doctrine of mitigation is concerned with post-injury conduct. KA argues that the "harm," for purposes of its mitigation defense, was KA's "continuing infringing conduct over a long period of time." This argument is not convincing because, as explained above, *Petrella* unequivocally approved the rule of separate accrual and held that every act of copyright infringement is an independently actionable legal wrong. *See, e.g.*, *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1023 (9th Cir. 2019).

Again, mitigation typically applies to consequential damages. As described in the Dobbs treatise, mitigation rules "apply in all kinds of cases. . . . But they do not apply to every kind of damages measurement. In general, avoidable consequences rules apply to require plaintiff to minimize special or consequential damages." Dobbs at § 3.9, p. 273. The basic rule of avoidable

---

[12] Mitigation, as KA acknowledges, is also referred to as the "doctrine of avoidable consequences." In tort law, the doctrine of avoidable consequences provides in relevant part that "one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure *after the commission of the tort*." Restatement (Second) of Torts § 918 (1979) (emphasis added); *see also* Prosser & Keeton on Torts § 65, at 458 (5th ed. 1984) ("The rule of avoidable consequences comes into play *after a legal wrong has occurred*.") (emphasis added).

consequences is that a "[d]efendant is entitled to a credit against liability for any consequential damages plaintiff could have avoided or minimized by reasonable effort or expense." *Id.* "Consequential damages" are "damages consequent upon but distinct from harm to plaintiff's entitlement." *Id.* at § 3.3(4), p. 231. In general, "the consequential measure attempts to protect plaintiff's income by awarding damages for losses of that income or, what is the same thing, for increases in expenses." *Id.* Thus, lost profits and collateral expenses are common forms of consequential damages.

Under the framework set forth in Dobbs, it is not surprising that district courts consider mitigation relevant to infringement claims. *See, e.g.*, *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *47–*48 (S.D. Tex. Oct. 27, 2010). "Actual damages" under the Copyright Act arise after each separate infringing act and are properly classified as consequential damages. That is because the "basic rule" for computing actual damages in copyright "is to inquire what revenue would have accrued to plaintiff but for the infringement." 4 Nimmer § 14.02[A][1].

Furthermore, the district court observed that a plaintiff's consequential damages may be relevant to the *amount* of statutory damages that are appropriate.  Courts have considered, inter alia, the conduct of parties when setting the *amount* of statutory damages. *See Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010). Hence, the district court appropriately instructed the jury to consider EIG's lost revenues and mitigation in determining the amount of statutory damages. But, as described above, statutory damages do not *only* approximate a copyright owner's consequential damages. Statutory damages *also* serve an independent deterrent purpose; therefore, mitigation rules do not wholly preclude recovery of statutory damages. *Cf. Moothart v. Bell*, 21 F.3d 1499, 1506–07 (10th Cir. 1994) (holding that the "mitigation of damages" is inapplicable to the disclosure provisions of

ERISA that were intended to "punish noncompliance . . . and not to compensate the participant" (internal quotation marks omitted)); 6 Patry on Copyright § 22:192.25, Westlaw (updated Mar. 2019) ("In the numerous troll infringement suits brought by Malibu Media, the argument has been often made that there was a failure to mitigate damages. Where plaintiff seeks only statutory damages, such a defense is meritless and should be struck since there is no requirement that statutory damages be pegged to actual damages.").

We hold that mitigation is not an absolute defense to statutory damages under the Copyright Act and the district court erred when it ruled otherwise.

## B. Mitigation of DMCA Damages

The jury concluded that KA's alteration of *Oil Daily*'s PDF filename ("DE" followed by the date of the newsletter) violated the DMCA's prohibitions on altering CMI. *See* 17 U.S.C. § 1202. The jury found 425 alterations, imposed statutory damages of $2,500 for each alteration (the minimum amount the jury was permitted to award), and concluded that EIG could reasonably have avoided all 425 alterations. Based on the jury's mitigation findings, the district court awarded EIG nothing on its DMCA claims.

For the same reasons that mitigation is not a complete defense to copyright statutory damages, mitigation is not a complete defense to DMCA statutory damages.

### i. *Background on the DMCA and § 1202*

Enacted in 1988, the Digital Millennium Copyright Act "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 458 (2007) (internal quotation marks omitted). In short, the DMCA was enacted primarily to address long-

standing concerns about technological circumvention of copyright protection.[13]

Section 1201 prohibits "circumvention" of any "technological measure that effectively controls access to" a protected work. 17 U.S.C. § 1201. Section 1201 is narrower in scope than § 1202, the provision at issue in this case. Though discussions of the DMCA's legislative history typically focus on Congress's concern about circumvention of copyright protection technologies, § 1202 does not express any focus on digital technology. Rather, § 1202 protects the "integrity of copyright management information" by prohibiting any person from intentionally removing or altering CMI if he or she knows or has reasonable grounds to know it would "induce, enable, facilitate, or conceal" copyright infringement. 17 U.S.C. § 1202(b).

ii. *Mitigation does not apply to DMCA statutory damages*

A person who violates §§ 1201 or 1202 is subject to the civil remedies set forth in § 1203. Section 1203 has notable parallels and divergences with § 504. Under both provisions, the plaintiff may seek either actual damages and defendant's profits, or statutory damages. At any time before final judgment, the plaintiff may elect to recover statutory damages. Unlike § 504, however, under § 1203, the trial court, in its discretion, may "reduce or remit the total award" if the defendant proves her violations were innocent. 17 U.S.C. § 1203(c)(5)(A).[14]

While noteworthy, these differences do not indicate that mitigation should be available as an absolute defense in DMCA claims. Like statutory

---

[13] For more general background on the DMCA, see Steve P. Calandrillo and Ewa M. Davison, *The Dangers of the Digital Millennium Copyright Act: Much Ado About Nothing?*, 50 WM. & MARY L. REV. 349 (2008).

[14] Unlike § 504(c), § 1203(c) also does not increase maximum statutory damages based on "willful" violations. However, as noted above, it does authorize up to treble damages for a defendant whose violations took place "within 3 years after a final judgment was entered against the person for another such violation." 17 U.S.C. § 1203(c)(4). Finally, unlike the Copyright Act, the DMCA does not encourage injured parties to provide notice before suit.

damages under § 504(c), the structure of statutory damages under § 1203 indicates an intent to deter, not just compensate. The court may treble damages, including statutory damages, if the defendant is a repeat offender. And textually, nothing in § 1203 requires statutory damages to be linked to actual damages. Therefore, mitigation is not an absolute defense to DMCA claims.

### iii. *PDF file names can be CMI*

KA also argues that as a matter of law, a PDF filename is not CMI because it is not listed in § 1202(c) and because downloading and renaming files is a common practice in the modern Internet era. Neither of these contentions has merit.[15]

CMI is defined broadly. It is "any of the following information conveyed in connection with copies . . . of a work," including "[t]he title and other information identifying the work," 17 U.S.C. § 1202(c)(1); "[t]he name of, and other identifying information about," the author, copyright owner, or performer, *Id.* § 1202(c)(2)-(4); or "[s]uch other information as the Register of Copyrights may prescribe by regulation," *id.* § 1202(c)(8). Nothing in § 1202 indicates that a digital file name cannot be CMI. Rather, a PDF's file name may be CMI if it is "conveyed in connection with copies" of the underlying work and contains a "title and other information identifying the work." *See* 17 U.S.C. § 1202(c)(1). EIG presented evidence at trial indicating that the "DE" naming

---

[15] The parties dispute whether KA has waived this argument on appeal by not renewing its motion for judgment as a matter of law after the verdict. "Technical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied." *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996). The purpose of a post-verdict Rule 50(b) motion is to allow the district court to "re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant." *Id.* (internal quotation marks omitted). The district court was able to do that here because in post-trial briefing, KA renewed its argument that the DMCA claims failed as a matter of law. KA has not waived this challenge.

convention was "information identifying" each *Oil Daily* newsletter.[16] Therefore, the PDF file names of *Oil Daily* were CMI.

### C. Section 411 Referral

KA contends that the district court erred in denying its late-filed motion for referral to the Copyright Office. KA's contention has two parts, one legal and one factual. First, KA argues that § 411 mandates referral whenever a party alleges that inaccurate information was knowingly included on an application for copyright registration. The district court's interpretation of § 411 is reviewed de novo.

Second, KA objects to the district court's conclusions that *Oil Daily* was accurately registered because it was not a compilation and that EIG had not knowingly included inaccuracies in its applications. These findings of fact are reviewed for clear error. *DeliverMed*, 734 F.3d at 622–23; Fed. R. Civ. P. 52(a)(6). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Three Expo Events, L.L.C. v. City of Dallas*, 907 F.3d 333, 338 (5th Cir. 2018) (quotation omitted).

We hold that § 411(b) does not require immediate referral to the Copyright Office to determine the materiality of alleged inaccuracies. We also hold that the district court did not clearly err when it concluded that EIG did not knowingly include inaccuracies in its copyright registration applications. Therefore, we AFFIRM the district court's dismissal of KA's motion for referral

---

[16] KA's policy concerns are exaggerated and unrealistic. Liability under § 1202(b) requires knowledge. Section 1202(b) states in relevant part, "No person shall, without the authority of the copyright owner or the law intentionally remove or alter any copyright management information . . . *knowing,* or, with respect to civil remedies under section 1203, having *reasonable grounds to know*, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b) (emphasis added). At trial, EIG presented evidence of KA's knowledge: KA employees believed that by renaming the *Oil Daily* newsletters "123," they would be able to avoid detection of illicit sharing.

No. 18-20350

to the Copyright Office.

i. *The trial court has discretion, prior to referral, to determine whether inaccuracies were knowingly included in copyright registrations*

To recover statutory damages, a copyright owner must have registered his works prior to infringement. 17 U.S.C. § 412. A copyright registration is invalid under § 412 if (A) the applicant knowingly included inaccurate information, and (B) the inaccurate information was material. 17 U.S.C. § 411(b)(1).

Section 411(b)(2) provides, "In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." KA contends that because it alleged inaccurate information, the court was required to seek a finding of materiality from the Register. In our view, the most reasonable reading of § 411(b) is that trial courts may, in their discretion, determine inaccuracy before making a referral to the Register.

The Seventh Circuit is the only appellate court to have spoken on this issue, and it ruled that

> [I]nput [from the Register] need not be sought immediately after a party makes such a claim. Instead, courts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality. . . . Once these requirements are met, a court may question the Register as to whether the inaccuracy would have resulted in the application's refusal.

*DeliverMed*, 734 F.3d at 625. In *DeliverMed*, the Seventh Circuit noted that its interpretation of § 411 was in accord with the Register's own views. *Id.* (citing Register's statement that "a court should feel free to determine whether there is in fact a misstatement of fact"). Because this interpretation and approach are persuasive, the district court did not err in denying KA's motion for referral

25

to the Copyright Office.

    ii. *The trial court did not clearly err in finding that <u>Oil Daily</u> is not a compilation*

KA makes a cursory argument on appeal that EIG's copyright registrations were inaccurate because EIG "concealed the fact that its works were compilations" subject to the registration requirements of 17 U.S.C. § 409(9) (requiring "in the case of a compilation or derivative work, an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered"). The Act defines "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id.* § 101.

As the district court observed, "the majority of the content contained in *Oil Daily* consists of previously unpublished articles created by reporters and editors employed by Plaintiffs." Although *Oil Daily* typically included some preexisting materials (e.g., Reuter's articles) or foreign materials from Russia and Singapore over which EIG could not claim authorship as a matter of foreign law, including a few non-authored articles in an otherwise original work does not transform the work into a "compilation." Therefore, the district court did not clearly err when it found that there were no inaccuracies in EIG's registration applications.

## D. Fee-shifting and Rule 68

Rule 68(d) provides, "If the judgment that the offeree finally obtains is not more favorable than [an] unaccepted [settlement] offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d). The judgment awarded EIG only $585,000, and KA had made a Rule 68 offer of

settlement for $5 million. Therefore, the district court found that EIG was responsible for paying its own post-offer costs and attorney's fees, as well as KA's post-offer costs. However, the district court, citing *Marek v. Chesny*, 473 U.S. 1, 9 (1985), found that EIG was not responsible for KA's post-offer attorney's fees. KA challenges that ruling on appeal.

The "term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or other authority." *Marek*, 473 U.S. at 9. Whether EIG must pay KA's post-offer attorney's fees depends on whether KA's attorney's fees were "properly awardable" under the Copyright Act or DMCA. EIG argues that KA's attorney's fees are not "properly awardable" because the substantive statutes only allow attorney's fees to be awarded to prevailing parties, and KA did not prevail. *See* 17 U.S.C. §§ 505 ("the court may also award a reasonable attorney's fee to the prevailing party as part of the costs"), 1203(b)(5) (the court "in its discretion may award reasonable attorney's fees to the prevailing party"). KA interprets *Marek* more broadly, as allowing an offeror to recover fees so long as the substantive statute authorizes the district court to award fees as part of costs to *some* party.

The Seventh and Ninth Circuits have distinguished or rejected KA's reading of *Marek* in the context of the Copyright Act. *See Harbor Motor Co. v. Arnell Chevrolet-Geo, Inc.*, 265 F.3d 638, 646 (7th Cir. 2001) (in copyright case, "only prevailing parties can receive attorney's fees pursuant to Rule 68"); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1034 (9th Cir. 2013) ("[A]ttorney's fees may be awarded as Rule 68 costs only if those fees would have been properly awarded under the relevant substantive statute in that particular case."). The First Circuit has also rejected KA's interpretation of *Marek*, which it deems a "deceptively simple syllogism," in the context of a claim under 42 U.S.C. § 1983. *Crossman v. Marcoccio*, 806 F.2d 329, 333 (1st Cir. 1986). "Although the logic of this syllogism is appealing," it "distort[s] the

law . . . by ignoring the two crucial words that serve to qualify the holding of the *Marek* case. . . . These two words—'properly awardable'—are . . . essential to the holding of *Marek*." *Id.* The Eleventh Circuit without analysis has allowed a non-prevailing offeror in a copyright suit to receive compensation for post-offer attorney's fees. *Jordan v. Time, Inc.*, 111 F.3d 102, 105 (11th Cir. 1997).[17]

Notably, *Marek* limited the extent to which a prevailing *plaintiff* who rejects a Rule 68 offer of settlement can recover her own post-offer attorney's fees, where the substantive statute allows prevailing parties to recover attorney's fees as a part of costs. 473 U.S. at 3–5 (setting forth procedural history). Under *Marek*, attorney's fees are not "properly awardable" to a non-prevailing party where the substantive statute only authorizes prevailing parties to recover fees as part of costs. *See Hescott v. City of Saginaw*, 757 F.3d 518, 529 (6th Cir. 2014) (discussing *Marek*'s "limited holding" "that prevailing civil-rights plaintiffs may be forced to bear *their own* post-offer attorneys' fees as part of the cost-shifting provisions from Rule 68") (emphasis added). Nevertheless, KA's appeal on this issue is mooted by our vacatur of the district court's judgment.

## III.

Having determined that mitigation does not provide an absolute defense

---

[17] There is no Fifth Circuit authority directly on point. In *E.E.O.C. v. Bailey Ford, Inc.*, 26 F.3d 570, 571 (5th Cir. 1994), the court stated that an employer-defendant in a sex discrimination case would not be able to recover attorney's fees under Rule 68 "without a determination that the action was frivolous, unreasonable, or without foundation." But civil rights enforcement provisions are unusual; even when they contain generic fee-shifting provisions that do not distinguish between plaintiff and defendant, prevailing defendants cannot recover fees unless they demonstrate that the plaintiff's action was "frivolous, unreasonable, or without foundation." *See, e.g.*, *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421 (1978) (enforcement action under Title VII of the Civil Rights Act of 1964); *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (42 U.S.C. §§ 1983, 1988). Moreover, the relevant statement in *Bailey Ford* was dicta because there, the defendant-offeror, as a threshold matter, could not even invoke Rule 68. *See Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981) (holding that Rule 68 is not available to a "defendant that obtained the judgment.").

to copyright infringement, we move to the appropriate relief. This court "must vacate an award of damages if the jury charge as a whole leaves substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Poullard v. Turner*, 298 F.3d 421, 423 (5th Cir. 2002) (internal quotation marks omitted). Even if the jury's intent is clear, this court can still remand to the trial court instead of entering judgment directly. *See Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002) (internal quotation marks omitted) (noting that the trial court is "charged, in the first instance," with giving effect to the jury's intent); *but see P & L Contractors, Inc. v. Am. Norit Co.*, 5 F.3d 133, 138 (5th Cir. 1993) (interpreting special interrogatories to reverse and render judgment on quantum meruit recovery).

The district court incorrectly instructed the jury that EIG could "not recover for any item of damage that they could have avoided through reasonable effort." It is difficult to ascertain from the record whether the jury would still have awarded $15,000 per infringed work if it had instead been properly instructed on the issue of mitigation. Therefore, the judgment must be vacated and the case remanded to determine the proper statutory damages for each of the 1,646 infringed works.

\* \* \*

We VACATE the copyright infringement judgment and REMAND to the district court for further proceedings. The district court's fees and costs determinations are also VACATED.[18] As noted above, we approve of the district court's application of *Marek* to Rule 68 but cannot affirm the district court's award because KA's challenge to it is now moot.

---

[18] Notably, the district court awarded substantial attorney's fees to EIG based in part on its view that a judgment of $585,000 was not adequate to deter willful copyright infringement. Whether further deterrence is needed, as well as the Rule 28 calculation, may change depending on the final judgment.

No. 18-20350

As to the DMCA violations, the parties agree that if mitigation is not a complete defense, the court should enter judgment for EIG. Therefore, we enter judgment in favor of EIG in the amount of $2,500 for each of KA's 425 DMCA violations, or $1,062,500.

We AFFIRM the district court's denial of KA's § 411(b) referral motion.